IN THE SUPREME COURT OF NORTH CAROLINA

No. 411A94-6

Filed 14 August 2020

STATE OF NORTH CAROLINA

v.

MARCUS REYMOND ROBINSON

On writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review an order

denying defendant's motion for appropriate relief filed pursuant to the Racial Justice

Act entered on 25 January 2017 by Judge W. Erwin Spainhour in Superior Court,

Cumberland County. Heard in the Supreme Court on 26 August 2019.

*Joshua H. Stein, Attorney General, by Danielle Marquis Elder, Senior Deputy Attorney General, and Jonathan P. Babb, Special Deputy Attorney General, for the State-appellee.*

*Cassandra Stubbs, Donald Beskind, David Weiss, and Brian Stull for defendant-appellant.*

*James E. Coleman Jr. for Charles Becton, Charles Daye, Valerie Johnson, Irving L. Joyner, Floyd B. McKissick Jr., Cressie H. Thigpen Jr., and Fred J. Williams, amici curiae.*

*Jeremy M. Falcone, Paul F. Khoury, Robert L. Walker, and Madeline J. Cohen for Former State and Federal Prosecutors, amicus curiae.*

*Carlos E. Mahoney, Jin Hee Lee, and W. Kerrel Murray for NAACP Legal Defense and Educational Fund, Inc., amicus curiae.*

*Janet Moore for National Association for Public Defense, amicus curiae.*

*James E. Williams Jr., Burton Craige, and Bidish Sarma for North Carolina Advocates for Justice, amicus curiae.*

*Grady Jessup for North Carolina Association of Black Lawyers, amicus curiae.*

*Cynthia F. Adcock for North Carolina Council of Churches, amicus curiae.*

*Lisa A. Bakale-Wise and Irving Joyner for North Carolina State Conference of the NAACP, amicus curiae.*

*Professors Robert P. Mosteller & John Charles Boger, amicus curiae.*

*Robert P. Mosteller for Retired Members of the North Carolina Judiciary, amicus curiae.*

*Joseph Blocher for Social Scientists, amicus curiae.*

BEASLEY, Chief Justice.

On 6 August 2009 the North Carolina General Assembly, recognizing the egregious legacy of the racially discriminatory application of the death penalty in this state, enacted the Racial Justice Act (the RJA or the Act). The goal of this historic legislation was simple: to abolish racial discrimination from capital sentencing. That is, to ensure that no person in this state is put to death because of the color of their skin.

Once implemented, the RJA worked as intended. Immediately, proceedings initiated pursuant to the Act revealed pervasive racial bias in capital sentencing in North Carolina. For defendant Marcus Reymond Robinson, the first condemned inmate to have a hearing pursuant to the RJA, the trial court found that he successfully proved that racial discrimination infected his trial and sentencing.

After Robinson proved his entitlement to relief under the RJA, the General Assembly amended the statute to increase the burden of proof, thereby

making it more difficult for claimants to prove racial bias and obtain relief. Nonetheless, the trial court held that the next three claimants met the higher standard and demonstrated that racial bias had infected their capital proceedings as well.

With 100% of claimants successfully proving their entitlement to relief and with more than 100 additional RJA claims filed, the vast majority of death row inmates were on the precipice of an opportunity to individually demonstrate that the proceedings in which they were sentenced to death were fundamentally flawed by racial animus. Rather than allowing these proceedings to follow their course, the General Assembly repealed the Act. The repeal was made retroactive: Robinson and the three other defendants who had already proven that their capital sentences were based on racially biased proceedings were returned to death row to await execution.

Today, we are not asked to pass on the wisdom of repealing a statutory mechanism for rooting out the insidious vestiges of racism in the implementation of our state's most extreme punishment.[1] That decision is for the General Assembly. Instead, this Court must decide whether the North Carolina Constitution allows for that repeal to be retroactive. We hold that it does not.

I.

---

[1] Nor are we asked to review the underlying facts of Robinson's offenses and his ultimate conviction of first-degree murder. Given the nature of the appeal before this Court, this Court's ruling on Robinson's claim under the Racial Justice Act does not negate or diminish his criminal culpability.

The Racial Justice Act prohibited capital punishment if race was a significant factor in the decision to seek or impose the death penalty. North Carolina Racial Justice Act, S.L. 2009-464, § 1, 2009 N.C. Sess. Laws 1213, 1214 [hereinafter Original RJA] (codified at N.C.G.S. §§ 15A-2010, -2011 (2009)) (repealed 2013). Defendants could use statistical evidence to meet their evidentiary burden and show that race was a significant factor in the county, the prosecutorial district, the judicial division, or the state at the time their sentence was imposed. *Id.*, § 1, 2009 N.C. Sess. Laws at 1214.

Defendants could show that race was a significant factor by demonstrating evidence of one or more of the following: that death sentences were sought or imposed significantly more frequently upon persons of one race; that death sentences were sought or imposed more frequently based on the race of the victim; or that race was a significant factor in decisions to exercise peremptory strikes during jury selection. *Id.* The State could offer rebuttal evidence, including its own statistical evidence. *Id.* If race was found to be a significant factor, defendants were legally ineligible to receive the death penalty; instead, they were sentenced to life imprisonment without the possibility of parole. *Id.*

The RJA was legislation unique to this state, most notably in its allowance of statistical evidence to prove racial discrimination. The Supreme Court of the United States has previously rejected the use of statewide statistical evidence in constitutional challenges to Georgia's death penalty scheme, finding that state legislatures "are better qualified to weigh and 'evaluate the results of statistical

studies in terms of their own local conditions.' " *McCleskey v. Kemp,* 481 U.S. 279, 319, 107 S. Ct. 1756, 1781 (1987) (quoting *Gregg v. Georgia,* 428 U.S. 153, 186, 96 S. Ct. 2909, 2931 (1976)). The General Assembly, however, recognized the difficulty of proving systemic discrimination absent statistical evidence. During the debates over the Act in the North Carolina Senate, Senator Doug Berger explained why the use of statistics was necessary, arguing that "[r]ace discrimination is very hard to prove. Rarely, particularly in today's time, do people just outright say, 'I am doing this because of the color of your skin.' "[2]

The RJA was the first law in the country to allow for a finding of racial discrimination during jury selection without requiring proof of intentional discrimination. The ability to serve on a jury is one of the many ways African-Americans have struggled to participate in our democratic processes. An understanding of the history and evolution of racial discrimination is necessary in order to understand why the RJA was passed. After the Civil War, the Supreme Court of the United States barred statutes that excluded African-Americans from serving as jurors. *Strauder v. West Virginia,* 100 U.S. 303 (1879). Recognizing that "[t]he very idea of a jury is a body of men composed of the peers or equals of the person whose rights it is selected or summoned to determine," the Supreme Court held that the Equal Protection Clause barred the exclusion of jurors based on their race. *Id.* at 308.

---

[2] Sen. Doug Berger, Floor Debate on Racial Justice Act (May14, 2009), https://archive.org/details/NorthCarolinaSenateAudioRecordings20090514/North_Carolina_Senate_Audio_Recordings_20090514.mp3

Discrimination still occurred in practice as local jurisdictions excluded African-Americans from being in jury venires, preventing them from being in the jury pool.

The Supreme Court of the United States addressed this newest form of discrimination by prohibiting "any action of a state, whether through its legislature, through its courts, or through its executive or administrative officers" that led to the exclusion of African-American jurors. *Carter v. Texas,* 177 U.S. 442, 447, 20 S. Ct. 687, 689 (1900); *see also State v. Peoples,* 131 N.C. 784, 790, 42 S.E. 814, 816 (1902) ("How can the forcing of [an African-American defendant] to submit to a criminal trial by a jury drawn from a list from which has been excluded the whole of his race, purely and simply because of color . . . be defended? Is not such a proceeding a denial to him of equal legal protection? There can be but one answer, and that is that it is an unlawful discrimination.").

Following these decisions, neither statutes nor local practices could legally exclude African-Americans from jury service. After the Civil War and Reconstruction, however, racism and legal segregation remained rampant in North Carolina and across the South. Facially race-neutral statutes, such as poll taxes and literacy tests, and the "separate but equal" fallacy were instituted to legally discriminate against African-Americans. In the early 1900s, African-Americans were excluded from jury service in North Carolina through laws requiring that jurors: (1) had paid taxes the preceding year; (2) were of good moral character; and (3) possessed sufficient intelligence. *See Peoples*, 131 N.C. at 788, 42 S.E. at 815; Benno C. Schmidt Jr., *Juries, Jurisdiction and Race Discrimination: The Lost Promise of Strauder v. West*

*Virginia,* 61 Tex. L. Rev. 1401, 1406 (1983) ("The problem of jury discrimination encompasses the half-century from the end of Reconstruction to the New Deal, during which the systematic exclusion of [B]lack men from Southern juries was about as plain as any legal discrimination could be short of proclamation in state statutes or confession by state officials.")

The same racially oppressive beliefs that fueled segregation manifested themselves through public lynchings, the disproportionate application of the death penalty against African-American defendants, and the exclusion of African-Americans from juries. Given the racially oppressive practices and beliefs that permeated every level of American society during the Jim Crow era, the constitutionally protected right of African-American defendants to be tried by a jury of their peers became increasingly important. The Supreme Court of the United States recognized that facially neutral statutes could violate the Fourteenth Amendment because "equal protection to all must be given—not merely promised." *Smith v. Texas*, 311 U.S. 128, 130, 61 S. Ct. 164, 165 (1940). The Supreme Court recognized that putting the fate of African-American defendants in the hands of all-white juries contradicted "our basic concepts of a democratic society and a representative government." *Id.*

As progress was made toward ensuring equal representation in juries, discrimination shifted from the composition of the venire to the composition of the jury itself. Peremptory challenges became the next tool for limiting African-Americans from serving as jurors because there were previously no African-American

jurors on the jury panel against whom peremptory challenges could be used. In North Carolina, the number of authorized peremptory challenges increased from six to fourteen during this period.[3]

In 1986 the Supreme Court of the United Sates recognized the persistent impact of racial discrimination and the exclusion of jurors of color during jury selection and established a three-part test to challenge discriminatory peremptory challenges. *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986). Although the Supreme Court's ruling in *Batson* and subsequent decisions sought to eliminate discrimination through the use of peremptory challenges, this Court has *never* held that a prosecutor intentionally discriminated against a juror of color.[4] The RJA was the General Assembly's recognition of *Batson*'s ineffectiveness in this state.

## II.

Robinson was convicted of first-degree murder and sentenced to death in 1994 in Superior Court, Cumberland County. On direct appeal, this Court found no error

---

[3] *See* An Act to Amend the Laws Relating to Criminal Procedure, ch. 711, § 1, 1977 N.C. Sess. Laws 711; An Act to Amend G.S. 9-21(b) to Increase from Six to Nine the Peremptory Challenges Allowed the State in Capital Cases, 1971 N.C. Sess. Laws 56.

[4] The North Carolina Court of Appeals has held that there was a *Batson* violation in only one case, where the prosecutor failed to offer any explanation for using peremptory challenges to strike two jurors. *State v. Wright*, 189 N.C. App. 346, 352–54, 658 S.E.2d 60, 64–65 (2008)). In two cases, the Court of Appeals held that the defendant had met their prima facie showing, but the underlying *Batson* challenge was unsuccessful upon remand. *See State v. McCord*, 158 N.C. App. 693, 696–99, 582 S.E.2d 33, 35–37 (2003); *State v. Sessoms*, 119 N.C. App. 1, 4–7, 458 S.E.2d 200, 202–04 (1995). The only "successful" *Batson* challenges have involved challenges alleging African-American defendants discriminated against white jurors. *See State v. Hurd*, 246 N.C. App. 281, 294, 784 S.E.2d 528, 537 (2016); *State v. Cofield*, 129 N.C. App. 268, 277–80, 498 S.E.2d 823, 830–32 (1998).

in his conviction and death sentence. *State v. Robinson*, 342 N.C. 74, 463 S.E.2d 218 (1995), *cert. denied*, 517 U.S. 1197 (1996). Robinson's claims for post-conviction relief were denied in state and federal court. *State v. Robinson*, 350 N.C. 847, 539 S.E.2d 646 (1999); *Robinson v. Polk*, 444 F.3d 225 (4th Cir. 2006), *cert. denied* 549 U.S. 1003 (2006). Robinson's claims under the RJA do not negate or diminish his guilt or the impact of his crimes on the victim's family, the victim's friends, and the community. Rather, the Act ensured that even those who commit the most serious offenses are entitled to a trial and sentencing free from racial discrimination.

Robinson filed a timely Motion for Appropriate Relief pursuant to the RJA on 6 August 2010. His hearing was scheduled thirteen months later on 6 September 2011. The State requested and the trial court granted a continuance of the hearing for an additional four months but later denied the State's third motion to continue on 30 January 2012. Robinson's hearing, which lasted thirteen days, involved testimony by seven expert witnesses and the introduction of over 170 exhibits.

Robinson's claim under the RJA relied heavily on a study of jury selection conducted by researchers at Michigan State University College of Law. Catherine M. Grosso & Barbara O'Brien, *A Stubborn Legacy: The Overwhelming Importance of Race in Jury Selection in 173 Post-Batson North Carolina Capital Trials*, 97 Iowa L. Rev. 1531 (2012) [hereinafter MSU Study]. The MSU Study examined jury selection in at least one proceeding for every inmate on death row in North Carolina as of 1 July 2010. This comprehensive study found that overall, African-American jurors were 2.26 times more likely than all other jurors to be struck by the State. The State

struck 52.6% of eligible African-American venire members, while only striking 25.7% of all other eligible venire members. The researchers also performed a fully-controlled regression analysis, controlling for non-race factors that could potentially have caused the juror to be struck. Even after taking into account all of these other factors, the results remained the same—African-American jurors were more than two times as likely to be struck as all other jurors. The MSU Study also showed similar disproportionate disparities in the county and judicial district of Robinson's trial.[5] In stark contrast to these findings, this Court has *never* ruled that the State intentionally discriminated against a juror of color in violation of *Batson*. Daniel R. Pollitt & Brittany P. Warren, *Thirty Years of Disappointment: North Carolina's Remarkable Appellate Batson Record,* 94 N.C. L. Rev. 1957, 1961—62 (2016).[6]

In support of the findings from the MSU Study, Robinson also presented evidence obtained through discovery. After introducing evidence that prosecutors across North Carolina attended a "Top Gun" training, which taught them how to articulate facially race-neutral reasons for striking African-American jurors, Robinson presented transcripts from a capital case in Cumberland County in which

---

[5] In Cumberland County, African-American jurors were struck at a rate of 52.7% compared to 20.5% for all other jurors. Cumberland County was a part of Second Judicial District from 1990 to 1999. In that district, African-American jurors were struck at a rate of 51.5%, compared to 25.1% for all other jurors. From 2000 to 2010 in the current Superior Court Division 4, African-American jurors were struck at a rate of 62.4%, compared to 21.9% for all other jurors.

[6] This Court recently published two *Batson* decisions, *State v. Hobbs,* 374 N.C. 345, 841 S.E.2d 492 (2020) and *State v. Bennett*, 843 S.E.2d 222 (2020). Although this Court ultimately remanded both matters for a new *Batson* hearing, we did not find that the State intentionally discriminated against a juror in violation of *Batson*.

the prosecutor used those exact reasons to justify striking an African-American juror. The trial court noted that "[i]nstead of training on how to comply with *Batson v. Kentucky*, and its mandate to stop discrimination in jury selection, North Carolina prosecutors received training in 1995 and 2011 about how to circumvent *Batson*." Robinson also obtained hand-written notes made by a prosecutor during jury selection in another Cumberland County capital case. These notes showed that an African-American juror with a criminal history was called a "thug," while a white juror with a criminal record was a "fine guy." An African-American juror was a "blk wino," while a white juror with a conviction for driving while impaired was a "country boy—ok."

Robinson also presented expert testimony about the role of implicit bias during jury selection. Robinson's experts testified about how race can influence decision-making at a subconscious level. One of Robinson's experts, Dr. Samuel Sommers, explained how "race often has an effect on judgments that we don't articulate when we are asked about those judgments." Rather than seeking to understand the role of implicit bias in their decision-making, prosecutors attended training to ensure that their race-based reasons for excluding jurors would not be subject to judicial scrutiny.

Robinson presented specific instances across the state where the race-neutral explanations given by prosecutors were pretextual or overtly based on race. Robinson presented evidence that an African-American juror was struck from the jury because of his membership in a historic African-American civil rights organization, the NAACP, and that another juror was struck from the jury because she graduated from

a historically black college and university, North Carolina A&T State University. Robinson further showed how African-American jurors were struck after being asked explicitly race-based questions, such as whether an African-American juror would be the "subject of criticism" by their "black friends" if they were to return a verdict of guilty. In multiple cases, prosecutors targeted African-American jurors by asking the jurors different questions than other jurors, such as whether their child's father was paying child support. African-American jurors were also struck for patently irrational reasons, such as membership in the armed forces. Robinson also showed more than thirty examples of prosecutors striking African-American jurors for objectionable characteristics yet passing on other similarly situated jurors.

The trial court, in its meticulously detailed findings, laid out how Robinson had shown that race was a significant factor during jury selection in his case. The trial court concluded that race was a significant factor in the decisions of prosecutors to exercise peremptory challenges to strike African-American jurors in Cumberland County, the former Second Judicial District, and the State of North Carolina as a whole from 1990 to 2010 and resentenced Robinson to life imprisonment without the possibility of parole.

Following Robinson's hearing, the General Assembly amended the RJA, limiting the scope of statistical evidence for future hearings. An Act to Amend Death Penalty Procedures, S.L. 2012-136, §§ 1–10, 2012 N.C. Sess. Laws 471 [hereinafter Amended RJA] (repealed 2013). The Amended RJA also included a provision that applied the amendment to any trial court orders vacated or overturned upon

appellate review, which could only apply to Robinson's case. Amended RJA, S.L. 2012-136, § 8, 2012 N.C. Sess. Laws at 473. After the overwhelming statistical evidence of systemic racial discrimination presented by Robinson, the General Assembly limited the use of that evidence in future proceedings.

On 1 October 2012, an evidentiary hearing under the Amended RJA was held for three additional defendants: Christina Walters, Quintel Augustine, and Tilmon Golphin. On 13 December 2012, the trial court entered an order granting relief for the three defendants after finding that they had established race as a significant factor in the State's use of peremptory challenges during jury selection.

After Robinson, Walters, Augustine, and Golphin showed that their death sentences were sought or imposed on the basis of race, the General Assembly repealed the RJA. Act of June 13, 2013, S.L. 2013-154, § 5.(a), 2013 N.C. Sess. Laws 368, 372 [hereinafter RJA Repeal]. The RJA Repeal was signed by the Governor on 19 June 2013. The repeal was retroactive and voided all pending motions for appropriate relief. *Id.*, 5.(d), 2013 N.C. Sess. Laws at 372. However, the RJA Repeal did not apply to a trial court order resentencing a defendant to life imprisonment without parole if that order is affirmed upon appellate review. *Id.*

The State petitioned this Court for a writ of certiorari, which this Court allowed on 11 April 2013, arguing that the trial court had abused its discretion by failing to grant the State's third motion to continue. We agreed and vacated the trial court's order granting Robinson's motion for appropriate relief without addressing

the merits of the underlying claim or the constitutional and statutory challenges to the RJA. *State v. Robinson,* 368 N.C. 596, 597, 780 S.E.2d 151, 152 (2015).[7]

A joint hearing was held in the Superior Court, Cumberland County, on 29 November 2016 on the motions for appropriate relief filed by Robinson, Walters, Augustine, and Golphin. The sole question considered by the trial court was whether the defendants' claims were rendered void by the RJA Repeal. The trial court found that the defendants' rights had not vested and that the RJA Repeal was not an ex post facto law, but the trial court did not reach the defendants' claims that the RJA Repeal violated the double jeopardy protections of the state and federal constitutions. The trial court erred by failing to consider Robinson's constitutional arguments. As discussed in Section III of this opinion, a proper analysis of Robinson's double jeopardy protections focuses on whether the trial court's order granting relief under the RJA constituted an acquittal of the death penalty. Because such an acquittal would categorically bar reimposition of the death penalty, it is a threshold matter to be addressed prior to any inquiries into the effect of legislation enacted subsequent to the acquittal. The trial court concluded that the RJA Repeal retroactively voided the defendants' claims and dismissed each of the defendants' motions for appropriate relief.

---

[7] This Court also vacated the orders granting relief to Walters, Augustine, and Golphin, finding that the trial court erred by joining the cases for an evidentiary hearing and that the error recognized in *State v. Robinson*, 368 N.C. 596, 780 S.E.2d 151 (2015), infected the trial court's decision. *State v. Augustine*, 368 N.C. 594, 594, 780 S.E.2d 552, 552 (2015).

Robinson filed a Petition for Writ of Certiorari on 30 May 2017, asking this Court to consider whether the retroactive application of the RJA Repeal violates the double jeopardy protections enshrined in our state constitution. We allowed the petition on 1 March 2018, and today we hold that the retroactivity provision constitutes such a violation.[8]

III.

Robinson argues that the RJA Repeal's retroactive application to those who previously received a sentence of life imprisonment without the possibility of parole after a hearing under the RJA violates the constitutional prohibition against double jeopardy. We agree. Once Robinson's death sentence was vacated under the RJA, Article I, Section 19 of the North Carolina Constitution barred the reinstatement of his capital sentence.

The prohibition against double jeopardy is a "fundamental and sacred principle of the common law, deeply imbedded in our criminal jurisprudence." *State v. Crocker,* 239 N.C. 446, 449, 80 S.E.2d 243, 245 (1954). It is an integral part of the Law of the Land clause, which guarantees that "[n]o person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land."

---

[8] Robinson also argues that the retroactivity provision is (1) an ex post facto law; (2) in violation of his vested rights; (3) a bill of attainder; (4) an arbitrary application of the death penalty; and (5) in violation of the separation of powers. Because this Court holds that the double jeopardy protections afforded under the North Carolina Constitution's Law of the Land Clause bar Robinson from being resentenced to death, we do not address Robinson's other constitutional arguments.

N.C. Const. art. I, § 19; *State v. Sanderson,* 346 N.C. 669, 676, 488 S.E.2d 133, 136 (1997) (citing *Crocker,* 239 N.C. 446, 80 S.E.2d 243) (noting that the prohibition against double jeopardy is embodied in the Law of the Land Clause of the North Carolina Constitution).[9]  This clause has appeared in every version of the North Carolina Constitution. *See* N.C. Const. of 1776, Declaration of Rights, § 12; N.C. Const. of 1886, art. I, § 17; N.C. Const. art. I, § 19.

A prohibition against double jeopardy was also included in the Bill of Rights of the Constitution of the United States in 1791 and applies to the states through the Fourteenth Amendment. U.S. Const. amend. V; *Benton v. Maryland,* 395 U.S. 784, 796, 89 S. Ct. 2056, 2063 (1969).  Our Court held that incorporation "added nothing to our law" because North Carolina's prohibition against double jeopardy "has always been an integral part of the law of North Carolina." *State v. Battle,* 279 N.C. 484, 486, 183 S.E.2d 641, 643 (1971). North Carolina's prohibition against double jeopardy, found in our Law of the Land Clause, predates any protections afforded under the Constitution of the United States. *See Crocker,* 239 N.C. at 449, 80 S.E.2d at 245 (finding that double jeopardy protections are an integral part of the Law of the Land Clause of our state constitution); *State v. Prince,* 63 N.C. 529, 531 (1869) (noting that the prohibition against double jeopardy "is a sacred principle of the [English]

---

[9] The Law of the Land Clause, which dates back to Chapter 39 of the Magna Carta, originally appeared in Section 12 of the Declaration of Rights in 1776 and read "[t]hat no freeman ought to be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty, or property, but by the law of the land." *See* Magna Carta ch. 39 (1215); *see also* John V. Orth & Paul M. Newby, *The North Carolina State Constitution* 68 (2d ed. 2013).

common law"); *State v. Garrigues,* 2 N.C. 241, 242 (1795) (disallowing the retrial of a defendant for the same offense after a hung jury).

In interpreting the double jeopardy protections of our state's Law of the Land Clause, we have often been guided by the decisions of the Supreme Court of the United States. *See Sanderson,* 346 N.C. 669, 488 S.E.2d 133. However, "[q]uestions concerning the proper construction and application of the North Carolina Constitution can be answered with finality only by this Court." *State v. Jackson,* 348 N.C. 644, 648, 503 S.E.2d 101, 103 (1998). This Court has "the responsibility to protect the state constitutional rights of the citizens," and this obligation "is as old as the State." *Corum v. Univ. of N.C. Through Bd. of Governors,* 330 N.C. 761, 783, 413 S.E.2d 276, 290 (1992). Thus, although we base our holding on the North Carolina Constitution, we may treat as persuasive the Supreme Court of the United States' reasoning regarding the double jeopardy protections afforded by the Constitution of the United States; we do so in this case. *See State ex rel. Martin v. Preston,* 325 N.C. 438, 450, 385 S.E.2d 473, 479 (1989) (observing that although this Court is not bound by the Supreme Court of the United States when interpreting state laws and our constitution, the reasoning used may be persuasive); *Bulova Watch Co., Inc. v. Brand Distribs. of N. Wilkesboro, Inc.*, 285 N.C. 467, 474, 206 S.E.2d 141, 146 (1974) (noting that "in the construction of the provision of the State Constitution, the meaning given by the Supreme Court of the United States to even an identical term in the Constitution of the United States is, though highly persuasive, not binding upon this Court").

Double jeopardy protections apply only if there has been some event, such as an acquittal, that terminates the original jeopardy. *Richardson v. United States*, 468 U.S. 317, 325, 104 S. Ct. 3081, 3086 (1984). If jeopardy is terminated by an acquittal, the State is barred from appealing any decision that might subject the defendant to another trial for the same offense. *See State v. Gardner*, 315 N.C. 444, 451, 340 S.E.2d 701, 707 (1986). An acquittal is "any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense." *Evans v. Michigan,* 568 U.S. 313, 318, 133 S. Ct. 1069, 1074–75 (2013). The prohibition on review of acquittals is one of the most fundamental rules in the history of double jeopardy. *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571, 97 S. Ct. 1349, 1354 (1977); *see also Evans*, 568 U.S. at 318, 133 S. Ct. at 1074; *Fong Foo v. United States*, 369 U.S. 141, 143, 82 S. Ct. 671, 672 (1962); *Green v. United States*, 355 U.S. 184, 188, 78 S. Ct. 221, 224 (1957). Accordingly, acquittals are final and unreviewable, even if based in error. *Ball v. United States*, 163 U.S. 662, 671, 16 S. Ct. 1192, 1195 (1896).

This is true even when the error made by the trial court is patent and unambiguous. In *Fong Foo*, the trial court, *sua sponte* in the middle of trial, directed the jury to acquit the defendant, which it did. *Fong Foo*, 369 U.S. at 141–42, 82 S. Ct. at 671. As an explanation, the trial court alleged that the prosecutor had behaved improperly and that the witnesses had been unconvincing. The Court of Appeals for the First Circuit held that the trial court had no power to grant the mid-trial

acquittal, and it subsequently directed the trial court to vacate the judgment and remanded the case for a new trial. *Id.* at 142, 82 S. Ct. at 671.

The Supreme Court of the United States reversed, holding that the case "terminated with the entry of a final judgment of acquittal," which "could not be reviewed without putting (the petitioners) twice in jeopardy"—an act flatly prohibited by the Fifth Amendment. *Id.* at 143, 82 S. Ct. at 672 (quoting *Ball*, 163 U.S. at 671, 16 S. Ct. at 1195). The Court acknowledged that it was reasonable to believe that the acquittal should be set aside because it "was based upon an egregiously erroneous foundation," but to set it aside would, nevertheless, violate the constitution. *Id.* The Supreme Court has "applied *Fong Foo*'s principle broadly." *Evans*, 568 U.S. at 318, 133 S. Ct. at 1074.

An acquittal, whether granted by the jury, the trial court, or an appellate court, is non-reviewable. *See Arizona v. Rumsey,* 467 U.S. 203, 210, 104 S. Ct. 2305, 2309 (1984) (noting that the fact the sentencer was the trial court rather than the jury did not limit double jeopardy protections); *Burks v. United States*, 437 U.S. 1, 17, 98 S. Ct 2141, 2150 (1978) (stating that the "purposes of the [Double Jeopardy] Clause would be negated" if double jeopardy did not prohibit retrial after an appellate court's finding of insufficient evidence); *United States v. Morrison*, 429 U.S. 1, 3, 97 S. Ct. 24, 26 (1976) (concluding that the trial court's finding of guilt is equivalent to a jury verdict of guilt for double jeopardy purposes).

Double jeopardy protections also extend to capital sentencing proceedings. *Sanderson*, 346 N.C. at 676, 488 S.E.2d at 136. Unlike other sentencing proceedings

when the sentencer has "unbound discretion to select an appropriate punishment from a wide range" and the prosecutor "simply recommend[s] what [he or she believes] to be an appropriate punishment," capital sentencing proceedings bear "the hallmarks of the trial on guilt or innocence." *Bullington v. Missouri,* 451 U.S. 430, 438–39, 101 S. Ct. 1852, 1858 (1981). Those proceedings present the sentencer with a choice between two alternatives, provide statutory standards to guide their decision-making, and require the prosecutor to prove certain additional facts in order to justify a particular sentence. *Id.*

In capital sentencing proceedings, a defendant is acquitted of the death penalty for purposes of double jeopardy when a life sentence is imposed after a finding that the State's evidence was insufficient to prove the existence of a single aggravating circumstance. *Rumsey*, 476 U.S. at 211, 104 S. Ct. at 2310. A life sentence "based on findings sufficient to establish legal entitlement to the life sentence[ ] amounts to an acquittal on the merits." *Id.* Therefore, the relevant inquiry to determine whether imposition of a life sentence was an acquittal for purposes of double jeopardy is "whether the sentencing judge or the reviewing court has 'decid[ed] that the prosecution has not proved its case' for the death penalty.*" Poland v. Arizona*, 476 U.S. 147, 154, 106 S. Ct. 1749, 1754 (1986) (alteration in original) (quoting *Bullington*, 451 U.S. at 443, 101 S. Ct. at 1860).

Our jurisprudence confirms that this is the proper inquiry. In *Sanderson*, we clarified that double jeopardy protections do not attach to each and every aggravating circumstance not sufficiently proved by the State, but rather attach in whole when

the State has failed to prove the existence of any aggravating circumstance. *Sanderson,* 346 N.C. at 679, 488 S.E.2d at 138. This is because in the capital sentencing phase the State's burden is not to prove the existence of every aggravating circumstance—akin to proving every essential element of a crime—but to prove the existence of at least one. N.C.G.S. § 15A-2000(c)(1) (2019). If the State fails to prove the existence of at least one aggravating circumstance, then the defendant is acquitted of the death penalty, jeopardy terminates, and the State may not seek to reimpose capital punishment. *Id.*

A defendant is acquitted of the charges against him when the State fails to carry its burden to prove the essential elements of an offense. *Evans,* 568 U.S. at 318, 133 S. Ct. at 1074–75. He may also be acquitted when the State proves every essential element of the crime, but the defendant successfully proves the existence of an excuse or justification in the form of an affirmative defense that negates his criminal liability.

In *Burks*, the defendant's principal defense at trial was the affirmative defense of insanity. *Burks*, 437 U.S. at 2, 98 S. Ct. at 2143. On appeal, he admitted that the State had proven the necessary elements to convict him of the offense but argued that the State had not presented sufficient evidence to overcome his affirmative defense. *Id.* at 3, 98 S. Ct. at 2413. The Court of Appeals for the Sixth Circuit agreed, finding insufficient evidence that the State had "effectively rebu[tted]" the testimony of the defendant's three expert witnesses regarding his affirmative defense. *Id.* at 4, 98 S. Ct. at 2143. The defendant's judgment was vacated, and the case was remanded

so the trial court could determine whether he should receive a directed verdict or a new trial. *Id.* Defendant appealed, arguing that the appellate court's ruling constituted an acquittal, regardless of whether it was entered before or after the verdict. *Id.* at 5, 98 S. Ct. at 2144. The Supreme Court of the United States agreed and held that "the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient." *Id.* at 18, 98 S. Ct. at 2150–51.

The same principles apply here because claims for relief under the RJA were similar in kind to an affirmative defense. Though the State carried its burden at trial by proving the existence of at least one aggravating circumstance, the Act allowed Robinson to be acquitted of the death penalty by presenting evidence that racial discrimination infected his trial and capital sentencing proceedings. The Act provided the State an opportunity to present rebuttal evidence, but the trial court found the State's rebuttal evidence to be insufficient. Just as in *Burks*, the fact that this "acquittal" was made by a reviewing court after the original trial in Robinson's case does not negate or limit his double jeopardy protections.

Once the trial court found that Robinson had proven all of the essential elements under the RJA to bar the imposition of the death penalty, he was acquitted of that capital sentence, jeopardy terminated, and any attempt by the State to reimpose the death penalty would be a violation of our state's constitution.

We conclude that the trial court's order resentencing Robinson to life in prison was an acquittal for purposes of double jeopardy. The sentence was imposed after a

hearing bearing "the hallmarks of the trial on guilt or innocence" and was based on findings sufficient to establish that Robinson was legally entitled to the imposition of a life sentence. *See Bullington,* 451 U.S. at 438–39, 101 S. Ct. at 1858. In finding that Robinson had proven his entitlement to relief under the RJA, the trial court acquitted him of the death penalty.

The RJA required the trial court to determine whether Robinson had proven his claim that his sentence of death was sought or imposed on the basis of his race. The Act established both the type and scope of evidence that Robinson could use to meet his burden. Original RJA, § 1, 2009 N.C. Sess. Laws at 1214. The trial court's order included findings of fact that established, in great detail, that Robinson had presented sufficient evidence to establish that race played a significant factor in the State's decision to seek or impose the death penalty and that his sentence was obtained on the basis of race. The trial court's order also included findings of fact establishing that the State had not offered evidence sufficient to rebut this determination. These findings established that Robinson was legally entitled to a life sentence under the Act. Therefore, the trial court did not merely impose a life sentence, it acquitted Robinson of the death penalty based on findings he was legally entitled to receive a life sentence under the Act.

Death penalty acquittals receive double jeopardy protection because of "both the trial-like proceedings at issue and the severity of the penalty at stake." *Monge v. California,* 524 U.S. 721, 733, 118 S. Ct. 2246, 2253 (1998) (emphasis omitted). The death penalty is the most serious punishment the state can impose, and the interests

protected by our Law of the Land Clause are consequently at their zenith. This Court has previously recognized that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual." *State v. Courtney*, 372 N.C. 458, 462, 831 S.E.2d 260, 264 (2019) (quoting *Green v. United States*, 355 U.S. 184, 187–88, 78 S. Ct. 221, 223 (1957)). To allow it to do so creates an "unacceptably high risk that the [State], with its superior resources, [will] wear down a defendant." *Bullington*, 451 U.S. at 445, 101 S. Ct. at 1861. The State must also not be allowed to use its superior resources and power to make repeated attempts to have a defendant sentenced to death, especially after that defendant has followed the procedures created by the state, has proven all that was required to be proved, and has been awarded relief under the statutory scheme designed by the state.[10]

The General Assembly passed legislation barring death sentences obtained on the basis of race. Robinson filed a timely motion for appropriate relief and presented

---

[10] Justice Ervin's dissenting opinion argues that Robinson is entitled to a new hearing, based on this Court's decision in *State v. Ramseur,* but it fails to recognize the significance of subjecting Robinson to an additional RJA hearing in its double jeopardy analysis. Citing to the case of *United States v. Wilson,* 420 U.S. 332, 95 S. Ct. 1013 (1975), the dissent argues that double jeopardy considerations do not prevent the government's ability to appeal an acquittal because reversal would simply reinstate the original verdict. However, if this matter were remanded for an additional hearing, the trial court would not be able to merely reinstate the original verdict. Instead, it would conduct a full RJA hearing, subjecting Robinson to an additional RJA proceeding. In the case of *Rumsey,* the Supreme Court expressly rejected the applicability of *Wilson* in the context of capital sentencing proceedings. *Rumsey,* 467 U.S. at 211, 104 S. Ct. at 2310. It reasoned that double jeopardy was not implicated in *Wilson* because, on remand, the trial court would "simply order the jury's guilty verdict reinstated" and the defendant would not be subjected to a second trial. *Id.* at 211-212, 104 S. Ct. at 2310. The Supreme Court noted that that if it were to remand the matter, the trial court would hold an additional capital sentencing hearing and would not merely reinstate the original verdict. *Id.* at 212, 104 S. Ct. at 2310.

sufficient evidence to show that he was entitled to a sentence of life imprisonment without parole. The State failed to present sufficient rebuttal evidence. After Robinson was granted relief, the General Assembly limited the use of the very statistical evidence that he had relied upon. After Walters, Augustine, and Golphin also showed that their sentences were sought or obtained on the basis of race, the General Assembly repealed the legislation altogether. The State is not only seeking another attempt at imposing a death sentence, it is seeking another attempt after having created a process which provided relief upon a showing of racial discrimination. If our constitution does not permit the State to use its power and resources over and over to obtain a conviction or impose the death penalty, it certainly does not allow the state to use that same power and resources to eliminate the remedy after a defendant has successfully proven his entitlement to that relief.

Double jeopardy protections provide certainty for defendants so that once acquitted of the death penalty, they have finality such that they may not later be resentenced to death. It also provides that same closure to the families of victims so that they are not asked to endure additional legal proceedings, never sure whether the current proceeding will, in fact, be the last. Additional proceedings beyond the hearing on Robinson's motion for appropriate relief would fail to protect either interest.

The Law of the Land Clause and the protections it affords against double jeopardy are older than this state. Those protections exist to protect defendants against the abuse of the State's virtually unlimited power to pursue prosecutions and

the interests that they protect—a defendant's very life and liberty—are the weightiest interests that our state and federal constitutions serve to protect. We hold that the State is barred from reimposing a death sentence under Article I, Section 19 of our state constitution, and Robinson's sentence of life imprisonment without the possibility of parole must be reinstated.[11]

## IV.

A valid judgment of a competent court is "the real and only authority for the lawful imprisonment of a person who pleads or is found guilty of a criminal offense." *In re Swink*, 243 N.C. 86, 90, 89 S.E.2d 792, 795 (1955). A judgment is final when there is no statutory basis for appeal and no petition for writ of certiorari has been filed. *State v. Green*, 350 N.C. 400, 408, 514 S.E.2d 724, 729 (1999).

The North Carolina Rules of Appellate Procedure allow for review of judgments and orders through a writ of certiorari, but review of a judgment or an order must be sought by the party seeking review. N.C. R. App. P. 21(a)(1). The distinction between

---

[11] We briefly address the impact of this Court's 18 December 2015 order vacating the trial court's order resentencing Robinson. The State filed a petition for writ of certiorari, which this Court allowed, asking this Court to review whether the trial court erred in: (1) its interpretation of the Racial Justice Act; (2) its findings of fact and conclusions of law; and (3) its failure to grant the State's third motion to continue. This Court ultimately determined that the trial court "abused its discretion by denying petitioner's third motion for a continuance" and remanded the matter for "reconsideration of respondent's motion for appropriate relief." *State v. Robinson*, 368 N.C. 596, 596–97, 780 S.E.2d 151, 151–52 (2015). We issued a similar order in the cases of Walters, Augustine, and Golphin. *See State v. Augustine*, 368 N.C. 594, 780 S.E.2d 552 (2015). Having now determined that defendant was acquitted of the death penalty under the Racial Justice Act, we conclude that any error by the trial court did not alter the essential character of the acquittal and our previous order does not impact our ultimate conclusion that Section 1, Article 19 of the North Carolina Constitution bars the reinstatement of defendant's capital sentence.

seeking review of a judgment and seeking review of an order is also present in Rule 4, which governs appeals in criminal cases. *See* N.C. R. App. P. 4(b) ("The notice of appeal . . . shall designate the judgment or order from which appeal is taken . . . ."); *see also State v. Miller*, 205 N.C. App. 724, 725, 696 S.E.2d 542, 543 (2010) (holding that the court lacked jurisdiction to hear the defendant's appeal of his judgment because the defendant appealed only the trial court's order denying his motion to suppress, not the trial court's final judgment).

Here, the State failed to petition this Court for review of the judgment through a writ of certiorari. When the trial court entered its order granting Robinson's motion for appropriate relief on 20 April 2012, it also entered a separate judgment and commitment order resentencing him to life in prison, pursuant to N.C.G.S. § 15A-1301. On 10 July 2012, the State filed a petition for writ of certiorari, which this Court allowed, that sought review of the order granting Robinson's motion for appropriate relief but not the trial court's judgment and commitment order vacating Robinson's death sentence and resentencing him to life in prison. No notice of appeal or petition for writ of certiorari was filed by the State as to the judgment or commitment order. Further, we note that parties must petition for review of post-conviction proceedings in death penalty cases within sixty days after delivery of the transcript of the hearing on the motion for appropriate relief to the petitioning party, a deadline that elapsed years ago. N.C. R. App. P. 21(f). Therefore, the State has failed to seek review of and now cannot seek timely review of the judgment sentencing Robinson to life in prison.

Furthermore, the State lacked the statutory authority to seek review of the judgment; it is, therefore, final and not subject to appellate review. The General Assembly has granted the State the statutory authority to seek appellate review in limited circumstances, and we construe those statutes narrowly. *State v. Elkerson*, 304 N.C. 658, 669, 285 S.E.2d 784, 791 (1982).

As a threshold matter, the General Assembly did not grant the State the power to appeal through the RJA. *See* Original RJA, §§ 1–2, 2009 N.C. Sess. Laws at 1213–15. The Act did provide that the procedures and hearing "shall follow and comply with G.S. 15A-1420, 15A-1421, and 15A-1422." *Id.*, § 1, 2009 N.C. Sess. Laws at 1215. Section 15A-1422 of the North Carolina General Statutes provides the State the right to seek review of a trial court's ruling on a motion for appropriate relief, but review is limited to those filed pursuant to N.C.G.S. § 15A-1415. N.C.G.S. § 15A-1422(c) (2019). Robinson's motion for appropriate relief was not filed pursuant to N.C.G.S. § 15A-1415. Rather, it was filed pursuant to the Act. Therefore, we find that the State lacked the statutory authority to appeal Robinson's judgment pursuant to N.C.G.S. § 15A-1422.

The State's only other statutory right to appeal is contained in N.C.G.S. § 15A-1445, which provides the State a right to appeal in the following circumstances, unless prohibited by the rule against double jeopardy:

> (1) When there has been a decision or judgment dismissing criminal charges as to one or more counts.

(2) Upon the granting of a motion for a new trial on the ground of newly discovered or newly available evidence but only on questions of law.

(3) When the State alleges that the sentence imposed:

> (a) Results from an incorrect determination of the defendant's prior record level under G.S. 15A-1340.14 or the defendant's prior conviction level under G.S. 15A-1340.21;

> (b) Contains a type of sentence disposition that is not authorized by G.S. 15A-1340.17 or G.S. 15A-1340.23 for the defendant's class of offense and prior record or conviction level;

> (c) Contains a term of imprisonment that is for a duration not authorized by G.S. 15A-1340.17 or G.S. 15A-1340.23 for the defendant's class of offense and prior record or conviction level; or

> (d) Imposes an intermediate punishment pursuant to G.S. 15A-1340.13(g) based on findings of extraordinary mitigating circumstances that are not supported by evidence or are insufficient as a matter of law to support the dispositional deviation.

N.C.G.S. § 15A-1445(a)(1)–(3) (2019). None of these provisions grant the State the statutory authority to appeal the trial court's judgment sentencing Robinson to life in prison. Therefore, the State lacked and continues to lack the statutory authority to appeal life sentences entered pursuant to the RJA.

Because the retroactivity provision of the RJA Repeal violates the double jeopardy protections of the North Carolina Constitution, because the State failed to appeal the judgment of the trial court, and because the State lacked the statutory authority to appeal that judgment in any event, we vacate the trial court's order

dismissing Robinson's claim under the RJA and remand for the reinstatement of a sentence of life imprisonment without parole.

VACATED AND REMANDED.

Justice HUDSON concurring in result.

While I agree with the majority that this case is controlled by double jeopardy principles stemming from the Law of the Land Clause of the North Carolina Constitution, I prefer to rely on the analysis of Part IV of the majority opinion. I do not agree that the trial court's lengthy order entered on 20 April 2012 was final; the State was permitted to and did seek review of it by filing a petition for writ of certiorari as provided by the Racial Justice Act. For the reasons set forth in Part IV of the majority opinion, however, I agree that the separate judgment and commitment order in which defendant Robinson was sentenced to life imprisonment without the possibility of parole, entered on that same date, was and remains a final judgment of which appellate review was neither sought nor obtained. Therefore, double jeopardy precludes further review of the judgment. Accordingly, I respectfully concur in the result.

Justice NEWBY dissenting.

As a monarch, King Louis XVI once famously said, *"C'est légal, parce que je le veux"* ("It is legal because it is my will.").[1] Today, four justices of this Court adopt the same approach to the law, violating the norms of appellate review and disregarding or distorting precedent as necessary to reach their desired result. Apparently, in their view, the law is whatever they say it is.

In essence the majority opinion presents three novel and unsupported theories of double jeopardy:

1) In the majority opinion Part III, it argues that this Court lacked the authority to vacate the 2012 RJA order, despite our order explicitly vacating it based on our holding that the trial court procedure was fundamentally flawed. Thus, the 2012 RJA order was not vacated and any attempt at appellate review violates double jeopardy principles.

2) In the majority opinion Part IV, it argues that, while this Court had the authority to review the 2012 RJA order and the corresponding amended judgment and commitment order (the amended J & C), the State failed to seek review of the amended J & C. In its petition for writ of certiorari which this Court granted, the State only sought review of the underlying 2012 RJA order. While the 2012 RJA order

[1] Jay Winik, *The Great Upheaval: America and the Birth of the Modern World, 1788–1800* 108 (HarperCollins 2007).

which was the basis for the amended J & C was vacated, our order did not vacate the corresponding amended J & C. The amended J & C is thus a final order.

3) In the majority opinion Part IV, it argues that, while this Court had the authority to review the 2012 RJA order, it did not have the authority to review the corresponding amended J & C.

The only theory of the majority opinion that has four votes is the second theory. Justice Hudson's opinion concurring in the result notes that, while she believes the State had the authority to seek review of the 2012 RJA order and corresponding amended J & C, it only specifically sought review of the 2012 RJA order. Because the State failed to seek review of the corresponding J & C, it became a final judgment. Even though four justices agree on only one of the theories, because that theory is set out in her opinion, and for ease of reading, I refer to Chief Justice Beasley's opinion as the "majority opinion."

The votes of the four justices prevent defendant's execution for murder. It appears, however, that three justices may have a larger purpose: to establish that our criminal justice system is seriously—and perhaps irredeemably—infected by racial discrimination. To accomplish that purpose, the three adopt findings of fact made by the trial court in an order previously vacated by this Court, the 2012 RJA order. Their reliance on a vacated order is totally at odds with fundamental legal principles and this Court's many precedents holding that vacated orders are null and void. What makes their action even more remarkable—and indefensible—is that we vacated that

order because the trial court denied the State adequate time to respond to the complex statistical evidence presented by defendant in support of his motion for appropriate relief under the Racial Justice Act. A one-sided version of the "facts" seems to suit their purpose.

The only order properly before this Court is the one the trial court entered after we vacated the 2012 RJA order and remanded the case, the 2017 remand order. The 2017 remand order dismissed defendant's RJA MAR upon finding that the General Assembly's repeal of the RJA applied to defendant's case. Because confining itself to the 2017 remand order would deprive it of the opportunity to attack the motives of prosecutors, jurors, and even judges, three justices try to revive the vacated order through a misapplication of double jeopardy law that fully deserves to be labeled judicial activism; the court is legislating changes in the law from the bench.

None of the majority opinion's theories implicate the constitutional prohibition against double jeopardy because none call into question the facts supporting defendant's conviction or the imposition of his capital sentence.

Although I dissented from this Court's holding in *State v. Ramseur*, 843 S.E.2d 106 (N.C. 2020), that case plainly controls the outcome here. It holds that the General Assembly's repeal of the RJA does not apply retroactively. Based on the trial court order which is actually before us, according to *Ramseur* and our 2015 order, we should be returning this case to the trial court for a full hearing on the merits of defendant's RJA claim at a proceeding where the State has a fair chance to respond. Instead of

doing the legally correct thing, the majority opinion picks its preferred destination and reshapes the law to get there. Inasmuch as today's decision cannot be justified on any legal basis, I respectfully dissent.

I.

a. Defendant's Crime and Punishment

In 1994 a jury convicted defendant of the murder of seventeen-year-old Erik Tornblom, who would have been a senior at Douglas Byrd High School. *State v. Robinson*, 342 N.C. 74, 78–80, 463 S.E.2d 218, 221–22 (1995) (*Robinson I*). Defendant and his accomplice, seventeen-year-old Roderick Williams, shot Tornblom in the face with a sawed-off shotgun after he agreed to give them a ride in his car. *Id.* at 79, 463 S.E.2d at 221. Before leaving the crime scene, defendant and Williams stole Tornblom's wallet and divided the twenty-seven dollars from it between them. *Id.* at 79, 463 S.E.2d at 221–22. Defendant admitted to law enforcement that they shot Tornblom even though he "kept begging and pleading for [defendant and Williams] not to hurt him, because he didn't have any money." *Id.* at 79, 463 S.E.2d at 221. Two days before the murder, defendant told his aunt that "he was going to burn him a whitey"; defendant repeated this statement three times. *Id.* at 80, 463 S.E.2d at 222. At trial a witness testified that, the day after the murder, defendant admitted that he had robbed a white man the night before and had shot him in the head. *Id.*[2]

---

[2] Despite the heinous nature of this crime, and the crimes committed by the defendants listed in footnote 7, the majority opinion hollowly asserts that its judicial

Defendant pled guilty to the charges of first-degree kidnapping, robbery with a dangerous weapon, possession of a weapon of mass destruction, felonious larceny, and possession of a stolen vehicle. *Id.* at 78, 463 S.E.2d at 221. The State tried defendant capitally on the count of first-degree murder. *Id.* On the murder charge, the jury found defendant guilty both on the basis of premeditation and deliberation and under the felony murder rule. *Id.* Defendant filed a pretrial motion, citing *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986), but neither the State nor the defense raised a *Batson* objection during jury selection. *See Batson*, 476 U.S. at 79, 106 S. Ct. at 1712 (holding that the Equal Protection Clause forbids a prosecutor from challenging potential jurors solely on account of their race and setting the factual threshold for a defendant to establish a prima facie case of purposeful discrimination in jury selection).

At the sentencing phase of the trial, the trial court presented the jury with the statutory aggravating circumstances supported by the evidence, *see Robinson I*, 342 N.C. at 85–86, 463 S.E.2d at 225; the jury was required to find that one or more of those aggravating circumstances existed beyond a reasonable doubt and outweighed any mitigating circumstances before recommending the death penalty, *see* N.C.G.S. § 15A-2000(c)(1)–(3) (2019). In recommending the death penalty, the jury unanimously found as aggravating circumstances that the murder was committed

---

elimination of the capital sentence "do[es] not negate or diminish [defendant's] guilt or the impact of his crimes on the victim's family, the victim's friends, and the community."

while defendant was engaged in the commission of first-degree kidnapping and robbery with a firearm and that the murder was especially heinous, atrocious, or cruel. *Robinson I*, 342 N.C. at 88–89, 463 S.E.2d at 227; *see* N.C.G.S. § 15A-2000(e)(5), (9) (2019). Consistent with the jury's recommendation, and as required by statute, the trial court entered a death sentence. *Id.*; *see, e.g.*, N.C.G.S. § 15A-2000 (2019).

On direct appeal, this Court unanimously found no error either in the trial or in the sentencing proceeding for the first-degree murder conviction and affirmed defendant's sentences, including the death sentence. *Robinson I*, 342 N.C. at 91, 463 S.E.2d at 228. Defendant raised no claims of racial discrimination on appeal. This decision included a proportionality review, in which this Court found the punishment consistent with other capital sentences given the circumstances of the crime. *Id.* at 88–91, 463 S.E.2d at 227–28. The Supreme Court of the United States denied further review. *Robinson v. North Carolina*, 517 U.S. 1197, 116 S. Ct. 1693 (1996). Defendant exhausted both state and federal post-conviction review and received a full evidentiary hearing in state court on his motion for appropriate relief (MAR). Defendant was scheduled to be executed on 26 January 2007, but his execution has been stayed.[3]

---

[3] On 22 January 2007, defendant filed a civil action in Superior Court, Wake County and obtained injunctive relief of his execution on the grounds that use of lethal injection to execute him would violate the Eighth Amendment.

b. The 2012 RJA Order

Defendant committed his crimes in 1991, before the original RJA was enacted in 2009. On 11 August 2009 the RJA became law, which allowed defendant and other death row inmates one year to file a motion pursuant to the Act. North Carolina Racial Justice Act, S.L. 2009-464, § 2, 2009 N.C. Sess. Laws 1213, 1215 [hereinafter the RJA] (codified at N.C.G.S. § 15A-2010 (2009)) (repealed 2013). Defendant filed a motion pursuant to the RJA (RJA MAR) on 6 August 2010. Defendant offered as his primary evidence a statistical study conducted by professors at the Michigan State University College of Law between 2009 and 2011, assessing jury selection statistics from across North Carolina. At the start of the hearing, the State moved for a third continuance because it needed more time to collect additional data from prosecutors throughout the state in order to address the study. *See State v. Robinson*, 368 N.C. 596, 597, 780 S.E.2d 151, 152 (2015) (*Robinson II*). The trial court denied that motion. *Id.* The trial court conducted a hearing and entered an order dated 20 April 2012 with a corresponding amended J & C. In its 2012 RJA order, the trial court stated: "[H]aving determined that Robinson is entitled to appropriate relief as to [his RJA claims], [the court] concludes that Robinson is entitled to have his sentence of death vacated, and Robinson is resentenced to life imprisonment without the possibility of parole." The amended J & C was entered based solely on this ruling in the 2012 RJA

order.[4] This Court allowed the State's petition for writ of certiorari to review the 2012

RJA order (including the amended J & C entered with it).[5]

After careful review, on 18 December 2015, this Court vacated the 2012 RJA

order, including the corresponding amended J & C. *Robinson II*, 368 N.C. at 597, 780

S.E.2d at 152. In our order, we stated:

> Central to [defendant's] proof in this case is a statistical
> study that professors at the Michigan State University
> College of Law conducted between 2009 and 2011.
> [Defendant] gave [the State] all of the data used for the
> study in May 2011 and a report summarizing the study's
> findings in July 2011. [Defendant] then provided the final
> version of the study to [the State] in December 2011,
> approximately one month before the hearing on
> [defendant's] motion began. At the start of the hearing, [the
> State] moved for a third continuance because it needed
> more time to collect additional data from prosecutors
> throughout the state and to address [defendant's] study.
> The trial court denied the motion.

*Id.* at 596, 780 S.E.2d at 151. We determined that the trial court should have allowed

the State's motion to continue:

> Section 15A-952 of the Criminal Procedure Act requires a
> trial court ruling on a motion to continue in a criminal
> proceeding to consider whether a case is "so unusual and

---

[4] Four justices hold that the State failed to seek review of this amended J & C.

[5] Before this Court could review the trial court's order, however, the legislature repealed the statutory provisions upon which defendant's RJA MAR relied. Act of June 13, 2013, S.L. 2013-154, § 5.(a), 2013 N.C. Sess. Laws 368, 372 [hereinafter the RJA Repeal]. On 19 June 2013, the RJA was repealed in its entirety. RJA Repeal, §§ 5.(a), 6, 2013 N.C. Sess. Laws at 372. On its face, the RJA Repeal legislation was to apply retroactively, though it exempted any judgments granting relief under the RJA that were affirmed on appeal and became final orders before the repeal's effective date. *Id.*, § 5.(d), 2013 N.C. Sess. Laws at 372.

so complex" that the movant needs more time to adequately prepare. N.C.G.S. § 15A-952(g)(2) (2013). [Defendant's] study concerned the exercise of peremptory challenges in capital cases by prosecutors in Cumberland County, the former Second Judicial Division, and the State of North Carolina between 1990 and 2010. The breadth of [defendant's] study placed [the State] in the position of defending the peremptory challenges that the State of North Carolina had exercised in capital prosecutions over a twenty-year period. [The State] had very limited time, however, between the delivery of [defendant's] study and the hearing date. Continuing this matter to give [the State] more time would have done no harm to [defendant], whose remedy under the Act was a life sentence without the possibility of parole. *See* N.C.G.S. § 15A-2012(a)(3). *Under these exceptional circumstances, fundamental fairness required that [the State] have an adequate opportunity to prepare for this unusual and complex proceeding.* Therefore, the trial court abused its discretion by denying [the State's] third motion for a continuance.

*Id.* (emphasis added). This Court further concluded that "[t]he trial court's failure to give [the State] adequate time to prepare resulted in prejudice." *Id.* at 597, 780 S.E.2d at 151–52.[6] In its decision, this Court "express[ed] no opinion on the merits of [defendant's] motion for appropriate relief," but vacated the 2012 RJA order and remanded to the trial court to "address [the State's] constitutional and statutory challenges pertaining to the Act." *Id.* at 596, 780 S.E.2d at 152. With the 2012 RJA order vacated, the case was remanded to the trial court to consider the State's challenges and, if needed, to conduct a new hearing, after giving the State adequate

---

[6] In seeking to reinstate the 2012 RJA order, the majority opinion remarkably faults the State for its failure to "present sufficient rebuttal evidence" despite this fundamentally flawed procedure.

time to prepare. *Id.*; *see also State v. Augustine*, 368 N.C. 594, 780 S.E.2d 552 (2015).[7]

The Supreme Court of the United States denied defendant's request to review this

---

[7] For the same and additional reasons, this Court also vacated a combined trial court order addressing RJA claims of three other defendants in *State v. Augustine*, 368 N.C. 594, 780 S.E.2d 552 (2015). On remand, since the primary issue involved whether the RJA Repeal could be applied retroactively, the trial court considered the viability of defendant's RJA MAR post-repeal along with the RJA MARs filed by the three defendants.

In *State v. Augustine*, 359 N.C. 709, 616 S.E.2d 515 (2005), this Court affirmed defendant Augustine's conviction for first-degree murder on the basis of malice, premeditation and deliberation and affirmed his death sentence for the killing of Officer Roy Gene Turner, Jr. In that case, one witness testified that he heard defendant Augustine say that "he was angry because his brother had '[gotten] some time' and that he wanted to shoot a police officer," *id.* at 713, 616 S.E.2d at 520 (alteration in original), and other witnesses testified that they "saw defendant [Augustine] take a black pistol out of his pocket and cock it while the officer was still in his car. As Officer Turner emerged from his vehicle, defendant [Augustine] raised himself up on the telephone booth and fired three or four rounds at close range, causing the officer to fall to his knees." *Id.* at 714, 616 S.E.2d at 521.

In *State v. Golphin*, 352 N.C. 364, 533 S.E.2d 168 (2000), co-defendants and brothers Kevin Salvador Golphin and Tilmon Charles Golphin, Jr., were tried capitally and each were convicted of two counts of first-degree murder, two counts of robbery with a dangerous weapon, one count of assault with a deadly weapon with intent to kill, one count of discharging a firearm into occupied property, and one count of possession of a stolen vehicle. *Id.* at 379, 533 S.E.2d at 183. In that case, the evidence showed that the defendants shot and killed two police officers, Trooper Lloyd E. Lowry and Deputy David Hathcock, when the officers stopped the defendants while responding to a dispatch call that identified the defendants as fleeing the scene of a robbery of a finance company while driving a stolen vehicle. *Id.* at 380, 533 S.E.2d at 183–84.

In *State v. Walters*, 357 N.C. 68, 588 S.E.2d 344 (2003), defendant Walters was tried capitally, was found guilty of two counts of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule, and was sentenced to death for both. *Id.* at 75, 588 S.E.2d at 349. Along with the murder charges, defendant Walters was found guilty of nine other felonies arising out of a gang's crime spree that involved, *inter alia*, multiple random kidnappings of women and their execution-style shooting, ultimately resulting in the death of two of those victims, Susan Moore and Tracy Lambert, and serious injury to the other victim, Debra Cheeseborough. *Id.* at 75–78, 588 S.E.2d at 349–50. "One of the two murder victims watched as her friend was fatally shot in her presence. The other begged to be shot versus having her throat cut before she was shot in the head. The surviving victim was kidnapped at gunpoint." *Id.* at 113, 588 S.E.2d at 371.

This Court's decision today would seem to control the outcome of these cases as well.

Court's order vacating the 2012 RJA order. *Robinson v. North Carolina*, 137 S. Ct. 67 (2016). Thus, without question, the decision by this Court to vacate the 2012 RJA order is final.

### c. The 2017 Remand Order

On remand, consistent with this Court's order, the trial court only considered whether the retroactive repeal of the RJA rendered void defendant's RJA MAR. It ultimately dismissed defendant's RJA MAR in an order filed on 25 January 2017, citing the legislature's intent that the 19 June 2013 repeal of the RJA apply retroactively. The trial court determined that "[t]his repealing legislation . . . unambiguously expressed the conclusion of the legislature that statistical evidence should not and could not be used to prove purposeful racial discrimination in a specific case." The statutory language, as the trial court noted, acknowledges that capital defendants retain all the constitutional rights, safeguards, and protections, including the right to a trial free from racial bias, that they enjoyed before the enactment of the RJA, during its tenure, and following its repeal. *See* Act of June 13, 2013, S.L. 2013-154, § 5.(b), 2013 N.C. Sess. Laws 368, 372 [hereinafter the RJA Repeal]. But, as the trial court concluded, the RJA Repeal "prohibited statistical evidence from unrelated cases from admission in evidence in a specific case."

The trial court acknowledged that the statutory language, on its face, "provides that it is retroactive and applies to any MAR filed pursuant to the RJA before 19 June 2013, and that all MARs filed before that date are void. Each MAR in these cases was

filed prior to the effective date of the act, 13 June 2013[;]" therefore, the RJA Repeal should retroactively apply to them. Applying the statutory language of the RJA Repeal, the trial court determined that the "resentencing orders to life imprisonment without parole were not affirmed upon appellate review, and because th[o]se orders were subject to appellate review, and were vacated, they were not final orders by a court of competent jurisdiction." The trial court concluded that, because no final order had been entered on defendant's RJA claims or his claims under the amended RJA, those claims were controlled by the RJA Repeal, and his RJA claims were void as a matter of law.

Having interpreted the statutory language as determinative, the trial court acknowledged contentions "that the repeal of the Racial Justice Act violates [defendants'] constitutional rights or limits access to the protections from discrimination that already exist under the North Carolina and United States Constitutions." Such contentions must overcome the presumption that the General Assembly enacts constitutional legislation. Relying on case law from this Court, the trial court concluded that a final judgment, rather than the filing of a MAR, could vest a defendant's right to a remedy under the RJA. Without a final judgment, the statutory remedy can be repealed by the legislature without constitutional implications.

In short, the remand trial court determined that, because no final order had been entered on defendant's RJA claims, those claims were controlled by the repeal

of the RJA, and his RJA claims were void as a matter of law. The trial court concluded that the unconditional repeal of the RJA warranted the dismissal of defendant's RJA motion, citing *Spooners Creek Land Corp. v. Styron*, 276 N.C. 494, 496, 172 S.E.2d 54, 55 (1970), and *In re Incorporation of Indian Hills*, 280 N.C. 659, 663, 186 S.E.2d 909, 912 (1972).

### d. Effect of the Vacated 2012 RJA Order

The 2017 remand order and this order alone is the subject of our review in this case. The 2012 RJA order, including its corresponding amended J & C, having been vacated no longer exists.

Significantly, on remand the trial court never conducted an evidentiary hearing or reached the merits of defendant's RJA claims. The State has never had an opportunity to present its evidence. Legally, there is no trial court order on the merits; it was vacated. Though I disagree with its decision, this Court has previously addressed the merits of the 2017 remand order in *Ramseur*, 843 S.E.2d 106, and invalidated the retroactive nature of the RJA Repeal. *Id.* at 118; *see id.* at 122–39 (Newby, J., dissenting).[8]

As stated in Justice Ervin's dissent, the decision in *Ramseur* should control this matter. But, unwilling to simply follow the law and decide the issue presented, the majority opinion takes the unprecedented and indefensible step of attempting to

---

[8] This dissent's analysis of the RJA, including its separation-of-powers discussion, is hereby incorporated by reference.

recreate and reinstate a trial court order that legally no longer exists. The only trial court order granting defendant relief under the RJA, the 2012 RJA order, has been declared null and void. The majority opinion, by an act of judicial will, seeks to resurrect whole cloth the 2012 RJA order, which this Court held to have been based on a fundamentally flawed process. *See Robinson II*, 368 N.C. at 597, 780 S.E.2d at 151–52. Thus, this Court vacated it as a result of its unfair proceedings. *Id.* ("The trial court's failure to give [the State] adequate time to prepare resulted in prejudice. Without adequate time to gather evidence and address [defendant's] study, [the State] did not have a full and fair opportunity to defend this proceeding." (internal citations omitted)). Nonetheless, the majority opinion faults the State for its failure to present adequate rebuttal evidence.

A vacated order is treated as if the order were never entered. *See Alford v. Shaw*, 327 N.C. 526, 543 n.6, 398 S.E.2d 445, 455 n.6 (1990) (defining "vacate" as "[t]o annul; to set aside; to cancel or rescind. To render an act void; as, to vacate an entry of record, or a judgment" (quoting *Black's Law Dictionary* 1388 (rev. 5th ed. 1979))). It "render[s] the judgment null and void"; if a judgment is vacated, "no part of it could thereafter be the law of the case." *Id.* "A void judgment is, in legal effect, no judgment. No rights are acquired or d[i]vested by it. It neither binds nor bars any one, and all proceedings founded upon it are worthless—as if judgment be rendered without service on the party, or his appearance." *Stafford v. Gallops*, 123 N.C. 19, 21–22, 31 S.E. 265, 266 (1898) (citations omitted). Regardless of the nature of the trial court's order, once it is vacated, it has no legal effect. Furthermore, the 2012 RJA order

procedurally is not even before this Court. Nonetheless, without analysis or apology, the majority opinion simply seeks to recreate it by raw judicial power. Despite the irredeemably flawed procedure and the State's never having had an opportunity to present its evidence, the majority opinion relies on and seeks to enforce the 2012 RJA order.

As stated earlier, the majority opinion presents three arguments only one of which garners four votes, resulting in the narrow holding that the State failed to appeal the amended J & C so that order is final. This argument is presented in Part IV of the majority opinion. Nonetheless, this dissent will address the arguments in the order in which they are presented in the majority opinion.

## II.

Even if by some judicial magic the 2012 RJA order were recreated and properly before the Court procedurally, the majority opinion's creative double jeopardy analysis is flawed. I agree with Justice Ervin's assessment that the double jeopardy argument is "barred by the law of the case doctrine." Furthermore, in a capital-sentencing context, double jeopardy only applies if the final reviewing court determines that the State failed to present evidence sufficient to establish an aggravating circumstance as required to justify a capital sentence. If the State failed to present sufficient evidence, it does not get another chance. Here there is no dispute that more than sufficient evidence supported the jury's finding of both aggravating

circumstances, justifying the jury's death sentence recommendation. Thus, a double jeopardy claim is not viable.

At the time of its passage, the General Assembly intended the RJA to provide a new MAR procedure through which a capitally sentenced defendant could collaterally challenge a death sentence. The RJA's procedure does not equate to a defendant's capital-sentencing proceeding because it does not conform to the standards of a criminal trial. It does not negate the facts of the underlying offense or aggravating circumstances, and it cannot serve as an affirmative defense to a sentence imposed during a defendant's capital sentencing. The RJA was simply a mechanism for a defendant to collaterally attack his sentence. Given that on appeal this Court vacated the only trial court order under the RJA, that order cannot constitute a final judgment on defendant's RJA MAR let alone an "acquittal" for double jeopardy purposes. There is no legal support for this approach. The majority opinion misstates and misapplies double jeopardy principles.

The Fifth Amendment of the United States Constitution contains a guarantee that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *see also Benton v. Maryland*, 395 U.S. 784, 794–96, 89 S. Ct. 2056, 2062–63 (1969) (incorporating the Double Jeopardy Clause to the States by the Fourteenth Amendment and noting its "fundamental nature" rooted in the English common law and dating back to the Greeks and the Romans); *State v. Brunson*, 327 N.C. 244, 247, 393 S.E.2d 860, 863 (1990) (recognizing the Law of the

Land Clause of the North Carolina Constitution as affording the same protections as the Double Jeopardy Clause of the federal constitution). "The law of the land clause, the basis for the former jeopardy defense in North Carolina, is conceptually similar to federal due process," and therefore we "view the opinions of the United States Supreme Court with high regard in the context of interpreting our own law of the land clause." *Brunson*, 327 N.C. at 249, 393 S.E.2d at 864 (citations omitted). This Court has previously rejected a "defendant's contention that the law of this state confers greater former jeopardy protection upon defendants than the federal law does." *Id.*

"Our double jeopardy case law is complex, but at its core, the Clause means that those acquitted or convicted of a particular 'offence' cannot be tried a second time for the same 'offence.' " *Gamble v. United States*, 139 S. Ct. 1960, 1964 (2019) (quoting U.S. Const. amend. V). The protections against double jeopardy prevent multiple attempts to convict a defendant of an offense or to retry him for that offense when he has already been acquitted. "It benefits the government by guaranteeing finality to decisions of a court and of the appellate system, thus promoting public confidence in and stability of the legal system. The objective is to allow the prosecution one complete opportunity to convict a defendant in a fair trial." *Brunson*, 327 N.C. at 249, 393 S.E.2d at 864 (1990) (citing *Arizona v. Washington*, 434 U.S. 497, 505, 98 S. Ct. 824, 830 (1978)).

Conceptually, "jeopardy" centers around the *factual* inquiry that determines guilt or innocence. "[A] defendant is placed in jeopardy in a criminal proceeding once the defendant is put to trial before *the trier of the facts*, whether the trier be a jury or a judge." *United States v. Jorn*, 400 U.S. 470, 479, 91 S. Ct. 547, 554 (1971) (emphasis added). A conviction or guilty plea brings finality if it represents the final judgment "with respect to the guilt or innocence of the defendant." *See Burks v. United States*, 437 U.S. 1, 15, 98 S. Ct. 2141, 2149 (1978) (discussing that "evidentiary insufficiency," rather than a trial error, decides whether the government has failed to prove its case "with respect to the guilt or innocence of the defendant"). The protection against *double* jeopardy provides that, "once a defendant is placed in jeopardy for an offense, and jeopardy terminates with respect to that offense, the defendant may neither be tried nor punished a second time for the same offense." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 106, 123 S. Ct. 732, 736 (2003). The State simply cannot retry a convicted defendant in pursuit of harsher punishment. *See Green v. United States*, 355 U.S. 184, 190–91, 78 S. Ct. 221, 225–226 (1957).

Finding double jeopardy presupposes a preceding final judgment, s*ee Burks*, 437 U.S. at 15, 98 S. Ct. at 2149. It "does not bar reprosecution of a defendant whose conviction is overturned on appeal." *Justices of Bos. Mun. Court v. Lydon*, 466 U.S. 294, 308, 104 S. Ct. 1805, 1813 (1984). "Without risk of a determination of guilt, jeopardy does not attach, and neither an appeal nor further prosecution constitutes double jeopardy." *Serfass v. United States*, 420 U.S. 377, 391–92, 95 S. Ct. 1055, 1064 (1975); *see also State v. Courtney*, 372 N.C. 458, 463 n.5, 831 S.E.2d 260, 265 n.5

(2019) ("[T]he State may proceed with a retrial when a defendant secures the relief of a new trial after an original conviction is vacated on appeal.").

Jeopardy will always terminate following a defendant's acquittal regardless of whether the acquittal originated from a jury or judge. *See Evans v. Michigan,* 568 U.S. 313, 328–29, 133 S. Ct. 1069, 1080–81 (2013). Hence, "[a] verdict of acquittal on the issue of guilt or innocence is, of course, absolutely final," *Bullington v. Missouri*, 451 U.S. 430, 445, 101 S. Ct. 1852, 1861 (1981), even if obtained erroneously, *see Green*, 355 U.S. at 188, 192, 78 S. Ct. at 223–24, 226. Notably, "an 'acquittal' cannot be divorced from the procedural context," *Serfass*, 420 U.S. at 392, 95 S. Ct. at 1064; it has "no significance . . . unless jeopardy has once attached and an accused has been subjected to the risk of conviction," *id.* at 392, 95 S. Ct. at 1065.

An acquittal, by its very definition, requires some finding of innocence and "actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571, 97 S. Ct. 1349, 1355 (1977). An acquittal is "any ruling that the prosecution's proof is insufficient to establish criminal liability for the offense." *Evans*, 568 U.S. at 318, 133 S. Ct. at 1074–75. In a capital-sentencing context, insufficient proof to establish criminal liability supporting the capital sentence means that the State failed to present evidence sufficient to prove that at least one of the statutory aggravating circumstances existed at the time that the defendant committed the capital offense. Like proving a criminal offense in the guilt or innocence phase of a capital trial, these

circumstances must be presented to a jury, and the jury must find at least one of the statutory aggravating circumstances existed beyond a reasonable doubt to impose the death penalty.

In *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), the Supreme Court of the United States clarified that "if the existence of any fact (other than a prior conviction) increases the maximum punishment that may be imposed on a defendant, that fact—no matter how the State labels it—constitutes an element, and must be found by a jury beyond a reasonable doubt." *Sattazahn*, 537 U.S. at 111, 123 S. Ct. at 739 (citing *Apprendi*, 530 U.S. at 482–84, 120 S. Ct. at 2348). Thus, in the capital-sentencing context, aggravating circumstances that make a defendant eligible for the death penalty "operate as 'the functional equivalent of an element of a *greater offense.*' " *Id.* (quoting *Ring v. Arizona*, 536 U.S. 584, 609, 122 S. Ct. 2428, 2428 (2002)). It is in that sense that the sentencing phase of a capital trial carries the "hallmarks of the trial on guilt or innocence." *Bullington*, 451 U.S. at 439, 101 S. Ct. at 1858; *id.* at 438, 101 S. Ct. at 1858 ("The presentence hearing resembled and, indeed, in all relevant respects was like the immediately preceding trial on the issue of guilt or innocence."). North Carolina's death penalty statutes reflect these principles. *See, e.g.*, N.C.G.S. § 15A-2000(c), (e), (f) (2019).[9]

---

[9] Following a guilty verdict of first-degree murder, in a separate trial phase the jury considers aggravating circumstances from a comprehensive list, N.C.G.S. § 15A-2000(e), presented pursuant to the Rules of Evidence, *see* N.C.G.S. § 8C-1 (2019), and weighs any mitigating circumstances in the defendant's favor, N.C.G.S. § 15A-2000(f). The jury must find the existence of an aggravating circumstance beyond a reasonable doubt and that that circumstance outweighs any mitigating circumstances before recommending the death

"If a jury unanimously concludes that a State has failed to meet its burden of proving the existence of one or more aggravating circumstances, double-jeopardy protections attach to that 'acquittal' on the offense of 'murder plus aggravating circumstance(s).' " *Sattazahn*, 537 U.S. at 112, 123 S. Ct. at 740. The reason for this determination "is not that a capital-sentencing proceeding is 'comparable to a trial,' but rather that 'murder plus one or more aggravating circumstances' is a separate offense from 'murder' simpliciter." *Id.* (first quoting *Arizona v. Rumsey*, 467 U.S. 203, 209, 104 S. Ct. 2305, 2309 (1984); then citing *Bullington*, 451 U.S. at 438, 101 S. Ct. at 1861) (internal citations omitted)).

In a capital-sentencing context, only after there has been a finding that no aggravating circumstance is present can a defendant claim an acquittal, *State v. Sanderson*, 346 N.C. 669, 679, 488 S.E.2d 133, 138 (1997), and "the touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an 'acquittal,' " *Sattazahn,* 537 U.S. at 109, 123 S. Ct. at 738. "[A]n acquittal on the merits by the sole decisionmaker in the proceeding is final and bars retrial on the same charge." *Poland v. Arizona,* 476 U.S. 147, 154, 106 S. Ct. 1749, 1754 (1986) (citing *Rumsey*, 467 U.S. at 211, 104 S. Ct. at 2310).

---

penalty. N.C.G.S. § 15A-2000(c)(1)–(3). This Court automatically reviews cases where a death sentence is imposed to ensure the defendant received a fair trial, free from prejudicial error, and that the death sentence was proportional to the facts of the defendant's individual case. *See* N.C.G.S. § 7A-27(a)(1) (2019).

The majority opinion correctly defines the term "acquittal" initially, but then blurs the lines between capital trials, capital-sentencing proceedings, and post-conviction procedures to broaden its definition. Simply referring to an event as an acquittal, however, does not make it so. For an event to be an "acquittal," it must tie factually to a defendant's guilt or innocence of the offense charged or factually determine that an aggravating circumstance to justify the death penalty does not exist. That definition of an acquittal remains the same and must be met regardless of the stage of the defendant's proceedings, whether during a defendant's capital trial or capital-sentencing proceedings, on appeal, or during post-conviction proceedings.

In *Sattazahn* the state statute required a unanimous jury to impose a death sentence. *Sattazahn*, 537 U.S. at 109–10, 123 S. Ct. at 738–39. When a jury was hopelessly deadlocked in the penalty stage, the same statutory scheme required the judge to enter life sentence. *Id.* At defendant Sattazahn's trial, the jury convicted him but was hopelessly deadlocked on the death penalty, and the judge imposed a life sentence. *Id.* at 104–05, 123 S. Ct. at 736. Defendant Sattazahn appealed, and the appellate court reversed the first-degree murder conviction and remanded the case for a new trial. *Id.* at 105, 123 S. Ct. at 736. On remand the State presented evidence of an *additional* aggravating circumstance, the jury again convicted defendant Sattazahn of first-degree murder, but this time imposed a death sentence. *Id.* Both the conviction and sentence were affirmed on appeal. *Id.* On review the Supreme Court of the United States determined that defendant Sattazahn's original life sentence was not an acquittal on the merits, *id.* at 109, 123 S. Ct. at 738, reiterating

that "it is not the mere imposition of a life sentence that raises a double-jeopardy bar," *id.* at 107, 123 S. Ct. at 737. The judge's imposition of a life sentence during the first trial was not an "acquittal" for double jeopardy purposes because the jury's inability to agree did not constitute a finding of fact that no aggravating circumstance existed. *See id.* at 112–13, 123 S. Ct. at 740.[10]

In *Bobby v. Bies*, 556 U.S. 825, 129 S. Ct. 2145 (2009), the Supreme Court of the United States considered a post-conviction attempt to vacate a defendant's death sentence based on the aggravating and mitigating circumstances the jury considered at his capital-sentencing proceeding. *Id.* at 831, 129 S. Ct. at 2150. In its analysis, the Supreme Court distinguished an actual acquittal for double jeopardy purposes from a post-conviction attempt to vacate a death sentence. *Id.* at 829, 129 S. Ct. at 2149. Defendant Bies argued that a then-recent case *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002), which prohibited the execution of intellectually disabled defendants, entitled him to post-conviction sentencing relief. *Id.* at 832, 129 S. Ct. at 2151. Defendant Bies contended that, because the jury in his case had found his

---

[10] A jury can also revisit previously submitted aggravating circumstances in a new capital-sentencing proceeding without implicating double jeopardy, if there has been no conclusive factual finding on those factors. *Sanderson*, 346 N.C. at 679, 488 S.E.2d at 138 (Double jeopardy principles did not prevent a jury's consideration of aggravating circumstances in a third capital-sentencing proceeding when neither jury previously found that no aggravating circumstance existed). *Compare Poland*, 476 U.S. at 154, 106 S. Ct. at 1755 (The failure to find one particular aggravating circumstance is not an acquittal for double jeopardy purposes and does not preclude the death penalty.), *with Rumsey*, 467 U.S. at 203, 205, 104 S. Ct. at 2305, 2307 (A life sentence imposed by a judge during a capital-sentencing proceeding, who found no aggravating circumstances, constituted an acquittal of the death penalty for purposes of the Double Jeopardy Clause.).

intellectual disability to be a mitigating circumstance at his prior sentencing hearing, the jury essentially found facts sufficient to settle the issue of his intellectual disability. *Id.* Considering this fact-finding as a type of "issue preclusion," the federal appeals court concluded that it, in conjunction with defendant Bies's newly recognized "*Aktins* defense" of intellectual disability, "acquitted" defendant Bies of his death sentence and vacated his death sentence. *Id.* at 832–33, 129 S. Ct. at 2151. In that court's view, any proceedings on defendant Bies's intellectual disability would violate double jeopardy. *Id.* at 833, 129 S. Ct. at 2151.

On review the Supreme Court of the United States first reiterated that "[t]he touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an 'acquittal.' " *Id.* (quoting *Sattazahn*, 537 U.S. at 109, 123 S. Ct. at 738). Since the State presented sufficient evidence to support the jury's finding of aggravated circumstances during the capital-sentencing proceeding, and the jury then voted to impose the death penalty, there was no "acquittal." *Id.* at 833–34, 129 S. Ct. at 2152. The State did not "twice put [defendant Bies] in jeopardy" because "neither the judge nor the jury had acquitted the defendant in his first . . . proceeding by entering findings sufficient to establish legal entitlement to the life sentence." *Id.* at 833, 129 S. Ct. at 2151–52 (first quoting U.S. Const. amend. V; then quoting *Sattazahn*, 537 U.S. at 108–09, 123 S. Ct. at 738). The issue in *Bies* did not involve serial prosecutions or an attempt by the State to procure a conviction or to increase defendant Bies's punishment, but rather his "second run at vacating his death sentence." *Id.* at 833–34, 129 S. Ct. at 2152 (quoting *Bies v. Bagley*, 535 F.3d

520, 531 (6th Cir. 2008) (Sutton, J., dissenting)). Such an inquiry does not implicate double jeopardy. *Id.*

A RJA MAR hearing does not involve serial prosecutions or an attempt by the State to procure a conviction or to increase a defendant's punishment. It is not akin to a trial on the merits as to the issue of punishment. The subject matter of the RJA hearing is unrelated to the murder that led to a defendant's conviction and sentence. Even if relief is granted under the RJA, it does not invalidate, excuse, or justify a defendant's guilt for that murder. A RJA hearing does not seek to increase a defendant's punishment; a defendant asserting RJA claims has already received the highest punishment available. Even if relief is initially granted under the RJA, a RJA hearing does not invalidate the aggravating circumstances that justified the imposition of the death sentence as required for an acquittal. Because defendant here "cannot establish that the jury or the court 'acquitted' him during his first capital-sentencing proceeding," *Sattazahn*, 537 U.S. at 109, 123 S. Ct. at 738, double jeopardy does not apply.

Nonetheless, the majority opinion creatively cites *Burks* in an attempt to support its argument. *See Burks*, 437 U.S. 1, 98 S. Ct. 2141. *Burks*, however, simply stands for the same basic proposition that the evidence presented at the guilt or innocence phase of defendant's capital trial must be sufficient to justify a defendant's conviction. *Id.* At his trial for a bank robbery, defendant Burks relied on an insanity defense and presented multiple expert witnesses to support that theory. *Id.* at 2–3,

98 S. Ct. at 2143. The prosecution offered, *inter alia*, its expert witnesses in rebuttal, but they acknowledged defendant Burks's "character disorder" and one of those witnesses equivocally answered whether defendant Burks was capable of conforming his conduct to the law. *Id.* at 3, 98 S. Ct. at 2143. Defendant Burks unsuccessfully moved for an acquittal before the case was submitted to the jury, which found him guilty. *Id.* Following his conviction, he argued that the evidence was insufficient to support the guilty verdict, and the trial court denied any relief. *Id.*

On direct appeal the reviewing court held that the prosecution had failed to rebut defendant Burks's proof of insanity at the guilt or innocence phase, a defense that could excuse his criminal culpability for the offense itself. *Id.* at 17–18, 98 S. Ct. at 2150–51. The appellate court reversed and remanded the case for the trial court to decide whether defendant was entitled to a new trial or a directed verdict of acquittal. *Id.* at 4, 98 S. Ct. at 2144.

On appeal to the Supreme Court of the United States, the issue presented was "whether a defendant may be tried a second time when a reviewing court has determined that in a prior trial the evidence was insufficient to sustain the verdict of the jury." *Id.* at 5, 98 S. Ct. at 2144. The Supreme Court concluded that, once the reviewing court found the evidence presented at his first trial insufficient to warrant a guilty verdict, the protection against double jeopardy prevented a *second trial* during which the prosecution could try to supply the evidence once lacking and secure a guilty verdict. *Id.* at 18, 98 S. Ct. at 2150–51.

> The appellate decision unmistakably meant that the [trial court] had erred in failing to grant a judgment of acquittal. . . . The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. This is central to the objective of the prohibition against successive trials.

*Id.* at 11, 98 S. Ct. at 2147 (footnote omitted). The Supreme Court then placed defendant Burks's scenario within the traditional double jeopardy protection that prevents a series of trials and repeated attempts *to convict* a defendant of a criminal offense:

> The Clause does not allow "the State . . . to make repeated attempts to convict an individual for an alleged offense," since "[t]he constitutional prohibition against 'double jeopardy' was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense."

*Id.* (quoting *Green*, 355 U.S. at 187, 78 S. Ct. at 223).

The RJA, however, does not constitute an affirmative defense to a capital offense because RJA relief does not negate proof of the elements of any capital offense or any aggravating circumstance in capital sentencing. The cases relied on by the majority opinion only find an acquittal when the evidence is legally *insufficient* to support proof of the offense committed or proof of the aggravating factors beyond a reasonable doubt. Defendant has already been convicted at his capital trial, received the highest sentence possible at his capital-sentencing proceeding before a jury, and both his conviction and sentence has been affirmed on appeal. Defendant has never received an "acquittal on the merits." *See Poland*, 476 U.S. at 154, 106 S. Ct. at 1754.

RJA claims are not part of a defendant's capital trial or capital-sentencing proceeding at all, but must be pursued by filing a collateral MAR. A post-conviction hearing on a RJA MAR does not bear "the hallmarks of the trial on guilt or innocence," as argued by the majority opinion because, as it also concedes, defendant's guilt or any other factual inquiry surrounding the nature of the offense at the time of its commission are not at issue.

To support the desired outcome, the majority opinion here seeks to expand the interpretation of double jeopardy far beyond that recognized by our case law or that of the federal courts. Without authority, the majority opinion tries to embed that expansive interpretation into our state constitution. Notably, this Court has held that the double jeopardy protection provided by our state constitution provides no greater protection than its federal counterpart. *Brunson*, 327 N.C. at 249, 393 S.E.2d at 864 (rejecting the "defendant's contention that the law of this state confers greater former jeopardy protection upon defendants than the federal law does").

III.

Recognizing the deficiencies in its double jeopardy analysis based on its attempt to resurrect the 2012 RJA order, the majority opinion submits alternative theories, again unsupported by law: The majority opinion argues that the State only sought appellate review of the 2012 RJA order, not the corresponding amended J & C entered pursuant to the 2012 RJA order. The majority opinion reasons that, even if the 2012 RJA order were vacated, the companion amended J & C remains effective

because it was not part of the certiorari review allowed by this Court. As previously noted, this theory—that the State failed to seek review of the amended J & C—is the only theory for which there are four votes. The majority opinion further argues that the State was prohibited from seeking any appellate review of the amended J & C.

Both of these creative arguments are indefensible. The only legal basis for the trial court's entry of the amended J & C was the 2012 RJA order. By allowing the State's petition for writ of certiorari to review the court's ruling of defendant's RJA MAR, this Court granted review of the entire proceeding. Once the 2012 RJA order was vacated, everything arising from it was likewise void. It is nonsensical to concede that the 2012 RJA order was properly before the Court, but the amended J & C was not. Similarly, there is no support that this Court's review of the amended J & C was prohibited. Both under our state constitution and applicable statutes the State had the authority to seek appellate review. Finally, as previously discussed, the validity of the 2012 RJA order with its corresponding amended J & C is not procedurally before this Court.

The General Assembly intended the RJA to allow a capitally sentenced defendant to collaterally challenge a death sentence by generally following the MAR procedures. Like any other trial court decision on a MAR, it is subject to appellate review. By allowing the State's petition for writ of certiorari, this Court provided appellate review of the entire MAR proceeding, including the process and any

resulting orders. It is indisputable that this Court has the authority to review the actions of any lower court.

The state constitution recognizes this Court's jurisdiction to review any decision of the courts below, N.C. Const. art. IV, § 12, and that it has subject matter jurisdiction regardless whether the trial court grants or denies relief, *see id.* art IV, § 12(1) ("The Supreme Court shall have jurisdiction to review upon appeal any decision of the courts below, upon any matter of law or legal inference."). This basic principle of appellate review rings particularly true here because this Court has appellate jurisdiction by statute over death penalty cases like this one. *See* N.C.G.S. § 7A-27(a)(1) (2019).

I agree with the statutory analysis of Justice Ervin in his dissenting opinion that the amended J & C was subject to appellate review which we granted when this Court allowed the State's petition for writ of certiorari. Our case law supports this perspective. In *State v. Stubbs*, 368 N.C. 40, 770 S.E.2d 74 (2015), this Court determined "the Court of Appeals has subject matter jurisdiction to review the State's appeal from a trial court's ruling on a [MAR] when the defendant has been granted relief in the trial court." *Id.* at 41, 42–43, 770 S.E.2d at 76. In that case, defendant Stubbs's 1973 guilty plea resulted in a sentence of life imprisonment, *id.* at 40, 770 S.E.2d at 75, but under the new Structured Sentencing Act, the length of his sentence would have likely been much shorter, *id.* at 40 n.1, 770 S.E.2d at 75 n.1 (citing N.C.G.S. §§ 15A-1340.10 to 1340.23 (effective 1 Oct. 1994)). In 2011 defendant Stubbs

filed a pro se MAR in the Superior Court, Cumberland County arguing that the new Structured Sentencing Act made "significant changes" in the sentencing laws and that his 1973 sentence now constituted cruel and unusual punishment under the Eighth Amendment to the federal constitution. *Id.* at 40, 770 S.E.2d at 75. After an evidentiary hearing, the trial court agreed, granted the MAR, and vacated defendant Stubbs's judgment and life sentence. *Id.* The trial court then resentenced defendant Stubbs to a term of thirty years, applied time served, and ordered his immediate release. *Id.* The State sought review by a petition for writ of certiorari. *Id.*

A panel of the Court of Appeals reversed the trial court's order and remanded to the trial court for reinstatement of the original 1973 sentence. *Id.* In doing so, it "addressed whether it had subject matter jurisdiction to review the State's appeal from a trial court's decision on a defendant's MAR when the defendant prevailed in the trial court." *Id.* at 42, 770 S.E.2d at 75. In taking up this same question on appeal, this Court first noted that "the General Assembly has specified when appeals relating to MARs may be taken" by writ of certiorari, for instance, when "the time for appeal has expired and no appeal is pending." *Id.* at 42–43, 770 S.E.2d at 76 (quoting N.C.G.S. § 15A-1422(c) (2014)). "[S]ubsection 15A-1422(c) does not distinguish between a MAR when the State prevails below and a MAR under which the defendant prevails." *Id.* at 43, 770 S.E.2d at 76.

> Accordingly, given that our state constitution authorizes the General Assembly to define the jurisdiction of the Court of Appeals, and given that the General Assembly has given that court broad powers "to supervise and control the

> proceedings of any of the trial courts of the General Court of Justice," [N.C.G.S.] § 7A-32(c), and given that the General Assembly has placed no limiting language in subsection 15A-1422(c) regarding which party may appeal a ruling on an MAR, we hold that the Court of Appeals has jurisdiction to hear an appeal by the State of an MAR when the defendant has won relief from the trial court.

*Id.* A trial court may not unilaterally reduce sentences without being subjected to appellate review. A trial court's order on a MAR is subject to review regardless of the prevailing party or subject matter. Significantly, this Court did not distinguish between review of the trial court's MAR ruling and any corresponding amended J & C.

In *State v. Bowden*, 367 N.C. 680, 766 S.E.2d 320 (2014), defendant Bowden unsuccessfully sought application of various credits to his life sentence at the trial court through a petition for writ of habeas corpus and later following a MAR hearing under N.G.G.S. § 15A-1420. *Id.* at 681–82, 766 S.E.2d at 321–22. Upon a second remand from the Court of Appeals, the trial court granted defendant relief and calculated and applied all of his credits to determine that defendant had served his entire sentence. *Id.* at 682, 766 S.E.2d at 322. Notably, though ordering defendant's unconditional release, the trial court anticipatorily "stayed its order the following day *pending final appellate review*." *Id.* (emphasis added). This Court reversed, recognizing that these credits have never applied toward the calculation of an unconditional release date for a similarly situated inmate like Bowden serving a life sentence." *Id.* at 685–86, 766 S.E.2d at 324. Even though the trial court had ordered defendant Bowden's immediate release through a MAR, this Court reversed upon

review, and defendant "remain[ed] lawfully incarcerated." *Id.* Like defendant Stubbs, defendant Bowden received more than one round of appellate review, both with the Court of Appeals and with this Court, even though he was twice denied relief by the trial court and once granted relief by the trial court.

Here the 2012 RJA order including the corresponding amended J & C, has been subjected to appellate review, has been determined to be the result of a fundamentally flawed procedure, and has been vacated. A vacated trial court order certainly carries no degree of finality and is void. *See Robinson II*, 368 N.C. at 597, 780 S.E.2d at 152.

It is ludicrous to say that defendant's resentencing in the amended J & C can stand alone when that resentencing could only legally occur based on the underlying 2012 RJA order. Certainly, the State sought review of defendant's resentencing through its petition for writ of certiorari when it sought review of the 2012 RJA order. That order explicitly stated that, "having determined that Robinson is entitled to appropriate relief as to [his RJA claims], . . . Robinson is entitled to have his sentence of death vacated, and Robinson is resentenced to life imprisonment without the possibility of parole." The amended J & C simply effectuated this order. There is no legal support for the holding that the State failed to appeal the amended J & C.

## IV.

In its apparent eagerness to undermine defendant's death sentence, the majority opinion steps outside our time-honored judicial role of simply deciding the

case before us. Of the three novel theories presented, only one, the narrowest, has four votes. These four justices hold that the State failed to seek judicial review of the amended J & C when this Court allowed review of the 2012 RJA order. As with the other two theories, there is no legal support for this position. There is no explanation of how an amended J & C, which effectuated the 2012 RJA order can legally exist apart from the 2012 RJA order. It does exist and is given substance purely by four votes. The majority opinion's extraordinary judicial activism is completely unnecessary. This case should be controlled by our prior decision in *Ramseur* and remanded to the trial court for a new RJA hearing. The majority opinion's result guarantees that the State will never have a fair hearing in court. The ultimate damage to our jurisprudence and public trust and confidence in our judicial system is yet to be determined. I dissent.

Justice ERVIN, dissenting

I am unable to join the Court's decision to reinstate the trial court's original order and judgment sentencing defendant to a term of life imprisonment rather than death based upon a determination that Judge Weeks' order finding that defendant's race had been a significant factor in the imposition of his death sentence was entitled to double jeopardy effect and that the State had not sought and was not entitled to seek appellate review of the judgment that Judge Weeks entered in light of the determination reflected in his order. On the contrary, I believe that the Court's holding that Judge Weeks' "order resentencing [defendant] to life in prison was an acquittal for purposes of double jeopardy" (1) fails to take the procedural context in which that decision was made into account despite the fact that the double jeopardy-related rules applicable to acquittals that occur before and after the initial verdict are different and (2) implicitly vacates this Court's 2015 order overturning Judge Weeks' decision and remanding this case to the Superior Court, Cumberland County, *State v. Robinson*, 368 N.C. 596, 780 S.E.2d 151 (2015), *cert. denied*, 137 S. Ct. 67, 196 L. Ed. 2d 34 (2016), despite the fact that the State sought review of Judge Weeks' decision in accordance with the applicable statutory provisions and prevailed before this Court on procedural grounds. As a result, given my belief that the Court's decision is simply inconsistent with the relevant decisions of this Court and the Supreme Court of the United States and with this Court's statutory authority to review decisions of the trial court in proceedings conducted pursuant to the Racial

Justice Act, I respectfully dissent from the Court's decision and would, instead, reverse the trial court's order and remand this case to the Superior Court, Cumberland County, for a hearing concerning the merits of defendant's Racial Justice Act claim on the basis of the logic set out in this Court's decision in *State v. Ramseur*, 843 S.E.2d 106 (2020), and our 2015 order.

As an initial matter, the Court's determination that Judge Weeks' order granting relief pursuant to the Racial Justice Act constituted a final acquittal for double jeopardy purposes cannot be squared with the relevant decisions of the Supreme Court,[1] which have stated that, in the event that a defendant is acquitted following a jury verdict or a decision made at a bench trial, double jeopardy considerations do not prevent the government from appealing the acquittal decision given that an appellate reversal would simply reinstate the original verdict rather than subject the defendant to a second trial. *See United States v. Wilson*, 420 U.S. 332, 344–45, 95 S. Ct. 1013, 1022, 43 L. Ed. 2d 232, 242 (1975). In view of the fact that the effect of an appellate decision vacating Judge Weeks' order and the related judgment and remanding this case to the Superior Court, Cumberland County, for further proceedings would, depending upon the result reached on remand, at most,

---

[1] As this Court has previously stated, the double jeopardy protection inherent in article I, section 19 of the state constitution affords the same protections to criminal defendants as the double jeopardy provision of the Fifth Amendment to the Constitution of the United States. *State v. Oliver*, 343 N.C. 202, 205, 470 S.E.2d 16, 18 (1996) (discussing double jeopardy and N.C. Const. art. I, § 19).

have the effect of reinstating the original jury verdict and the resulting death sentence, I am not persuaded that Judge Weeks' order and the related judgment were entitled to preclusive effect or that the order and judgment must be reinstated.

In *Wilson*, the defendant was charged with converting union funds in order to pay for his daughter's wedding reception in violation of federal law. *Id.* at 333, 95 S. Ct. at 1017, 43 L. Ed. 2d at 235–36. The government began its investigation into the defendant's alleged unlawful conduct in April 1968, concluded that investigation in June 1970, and did not indict the defendant for another sixteen months, formally charging him three days prior to the expiration of the applicable statute of limitations. *Id.* at 333–34, 95 S. Ct. at 1017, 43 L. Ed. 2d at 235–36. The defendant filed a pretrial motion seeking to have the indictment dismissed on the grounds that the government's delay in charging him had prejudiced his ability to obtain a fair trial given that two defense witnesses—one of whom had died and the other of whom was suffering from a terminal illness—would be unavailable to testify. *Id.* at 334, 95 S. Ct. at 1017, 43 L. Ed. 2d at 236. After the trial court denied the defendant's dismissal motion, the jury found the defendant guilty. *Id.* Following the return of the jury's verdict, the defendant filed several post-verdict motions in which he reiterated his assertion that, among other things, the charge that had been lodged against him should have been dismissed on the basis of preindictment delay. *Id.* At that point, the district court reversed itself and dismissed the indictment that had been returned against the defendant on the grounds that he had been subject to

unreasonable preindictment delay that had prejudiced his ability to obtain a fair trial. *Id.* Although the government appealed from the trial court's order, the United States Court of Appeals for the Third Circuit dismissed the government's appeal on the grounds that the trial court's dismissal decision constituted an acquittal that was entitled to double jeopardy effect. *Id.* at 335, 95 S. Ct. at 1017–18, 43 L. Ed. 2d at 236–37. After granting certiorari, the Supreme Court reversed the Third Circuit's decision on the grounds that the government was entitled to appeal from the district court's dismissal order given that the challenged order was not entitled to preclusive effect.[2] *Id.* at 352–53, 95 S. Ct. at 1026, 43 L. Ed. 2d at 246–47.

In rejecting the defendant's argument that the Double Jeopardy Clause precluded the government from appealing the district court's dismissal order, the Supreme Court recognized that "[t]he development of the Double Jeopardy Clause from its common-law origins . . . suggests that it was directed at the threat of multiple prosecutions, not at Government appeals, at least where those appeals would not require a new trial." *Id.* at 342, 95 S. Ct. at 1021, 43 L. Ed. 2d at 241. Thus, "where there is no threat of either multiple punishment or successive prosecutions, the Double Jeopardy Clause is not offended." *Id.* at 344, 95 S. Ct. at 1022, 43 L. Ed. 2d at 242. For that reason, prosecutorial appeals of adverse rulings noted after the

---

[2] The Supreme Court of the United States assumed, without deciding, that an order dismissing a case based upon prejudicial preindictment delay would constitute an acquittal for double jeopardy purposes. *Wilson*, 420 U.S. at 336, 95 S. Ct. at 1018, 43 L. Ed. 2d at 237.

return of the jury's verdict or the judge's decision at the conclusion of a bench trial do not implicate double jeopardy considerations because "reversal on appeal would merely reinstate the jury's verdict" without "offend[ing] the policy against multiple prosecution." *Id.* at 344–45, 95 S. Ct. at 1022, 43 L. Ed. 2d at 242. Simply put, the "[c]orrection of [a post-verdict error of law by a trial judge] would not grant the prosecutor a new trial or subject the defendant to the harassment traditionally associated with multiple prosecutions." *Id.* at 352, 95 S. Ct. at 1026, 43 L. Ed. 2d at 247. As a result, the Supreme Court held that, "when a judge rules in favor of the defendant after a verdict of guilty has been entered by the trier of fact, the Government may appeal from that ruling without running afoul of the Double Jeopardy Clause," *id.* at 352–53, 95 S. Ct. at 1026, 43 L. Ed. 2d at 247, and that, given that the jury had returned a verdict convicting the defendant, the government's appeal from the district court's order dismissing the indictment that had been returned against the defendant could be entertained by the appellate courts without placing the defendant in jeopardy multiple times for the same offense. *Id.* at 353, 95 S. Ct. at 1026–27, 43 L. Ed. 2d at 247 (stating that, "if [the defendant] prevails on appeal, the matter will become final, and the Government will not be permitted to bring a second prosecution against him for the same offense").[3]

---

[3] The Supreme Court has reiterated its decision that the Government is entitled to seek appellate review of a post-verdict ruling acquitting a defendant as long as such an appeal does not subject the defendant to multiple prosecutions or punishments on multiple occasions since *Wilson*. *See, e.g.*, *Smith v. Massachusetts*, 543 U.S. 462, 467, 125 S. Ct. 1129, 1134, 160 L. Ed. 2d 914, 922–23 (2005) (stating that, "[w]hen a jury returns a verdict of guilty and a

Although this Court has not previously addressed the issue decided by the Supreme Court in *Wilson*, the Court of Appeals has adopted an approach to this issue that is consistent with the one that I believe to be appropriate. In *State v. Scott*, the State appealed from the trial court's order granting a post-verdict motion to dismiss for insufficiency of the evidence. 146 N.C. App. 283, 285, 551 S.E.2d 916, 918 (2001), *rev'd on other grounds*, 356 N.C. 591, 573 S.E.2d 866 (2002). In rejecting the defendant's contention that the State had no right to note an appeal from the trial court's dismissal order and that allowing the State's appeal would result in a double jeopardy violation, *id.* at 285–86, 551 S.E.2d at 918–19, the Court of Appeals began by recognizing that, "[a]t common law, the State had no right to bring an appeal" and could only be "authorized to do so by statute." *Id.* at 285, 551 S.E.2d at 918. As a general proposition, the State is entitled to pursue an appeal from an adverse trial court decision "[u]nless the rule against double jeopardy prohibits further prosecution," including instances in which "there has been a decision or judgment dismissing the criminal charges as to one or more counts." N.C.G.S. § 15A-1445(a)(1) (2019). In light of the fact that the trial court's dismissal order constituted a decision

---

trial judge (or an appellate court) sets aside that verdict and enters a judgment of acquittal, the Double Jeopardy Clause does not preclude a prosecution appeal to reinstate the jury verdict of guilty" (citing *Wilson*, 420 U.S. at 352–53, 95 S. Ct. at 1026, 43 L. Ed. 2d at 246–47)); *Evans v. Michigan*, 568 U.S. 313, 329–30 n.9, 133 S. Ct. 1069, 1081 n.9, 185 L. Ed. 2d 124, 140 n.9 (2013) (stating that, "[i]f a court grants a motion to acquit after the jury has convicted, there is no double jeopardy barrier to an appeal by the government from the court's acquittal, because reversal would result in reinstatement of the jury verdict of guilt, not a new trial" (citing *Wilson*, 420 U.S. at 332, 95 S. Ct. at 1013, 43 L. Ed. 2d at 232)).

or judgment dismissing criminal charges, the Court of Appeals concluded that "the State [was] within its statutory authority to bring this appeal as long as it [did] not violate the rule against double jeopardy," *Scott*, 146 N.C. App. at 285, 551 S.E.2d at 918, and that the State's appeal did not result in a double jeopardy violation because "reversal would only serve to reinstate the verdict rendered by the jury," with "defendant [being] in no danger of re[-]prosecution [because] the appeal does not place the defendant in double jeopardy." *Id.* at 286, 551 S.E.2d at 918 (citing *Wilson*, 420 U.S. at 344–45, 95 S. Ct. at 1022–23, 43 L. Ed. 2d at 242). According to the Court of Appeals, "[t]he emphasis of double jeopardy is on the possibility of [the] defendant being subjected to a new trial—not whether the dismissal acts as a verdict of not guilty"—and that, "[a]s long as [the] defendant would not be subjected to a new trial on the issues, his double jeopardy rights have not been violated." *Id.* at 286, 551 S.E.2d at 919. As a result, the Court of Appeals held that the State could lawfully bring its appeal. *Id.*

Assuming, for the purpose of discussion, that Judge Weeks' decision to grant defendant's motion for appropriate relief by affording defendant relief pursuant to the Racial Justice Act and to enter a judgment sentencing him to a term of life imprisonment constituted an acquittal as that term is used in double jeopardy jurisprudence, that decision was not unreviewable and double jeopardy was not implicated because any appellate reversal of that decision would, at most, result in the reinstatement of the defendant's original sentence and would not subject

defendant to a new trial.[4] All of the decisions upon which this Court relies in reaching a different result involve either acquittals that occurred during or prior to, rather than after, the return of initial jury or judicial verdicts convicting or acquitting the defendant of the commission of a substantive criminal offense or sentencing the defendant to death; determinations that the decision in defendant's favor was not entitled to double jeopardy effect at all; or holdings that a determination made on direct appeal or in postconviction proceedings was entitled to double jeopardy effect upon becoming final. *Evans*, 568 U.S. at 324, 133 S. Ct. at 1078, 185 L. Ed. 2d at 137 (holding that the trial court's erroneous ruling that the prosecution had failed to prove the existence of an alleged element of the crime at defendant's trial that it was not, in fact, required to prove was not subject to appellate review); *Monge v. California*, 524 U.S. 721, 734, 118 S. Ct. 2246, 2253, 141 L. Ed. 2d 615, 628 (1998) (refusing to afford double jeopardy effect to an appellate determination that a trial court conclusion that the defendant had committed a "qualifying felony" for purposes of California's "three strikes and you're out" law lacked sufficient evidentiary support

---

[4] The fact that a refusal to afford Judge Week's order double jeopardy effect will require defendant to participate in a new hearing under the Racial Justice Act does not, unlike the situation at issue in *Arizona v. Rumsey*, 467 U.S. 203, 211–12, 104 S. Ct. 2305, 2310, 81 L. Ed. 2d 164, 172 (1984), in which the "acquittal" that barred retrial occurred on direct appeal from the trial court's initial judgment rather than in a post-conviction proceeding, does not, at least in my opinion, suffice to require that Judge Weeks' order be treated differently than any other postconviction acquittal, with there being no decision of either this Court or the Supreme Court of which I am aware having reached such a result and with the Supreme Court's decision to remand for further proceedings in *Bobby v. Bies*, 556 U.S. 825, 837, 129 S. Ct. 2145, 2154, 173 L. Ed. 2d 1173, 1183 (2009), appearing to me to conflict with the logic upon which the Court relies.

on the grounds that this determination did not constitute an acquittal for double jeopardy purposes); *Poland v. Arizona*, 476 U.S. 147, 157–57, S. Ct. 1749, 1757, 90 L. Ed. 2d 123, 133 (1986) (holding that a new capital sentencing hearing may be held when, in the course of a death-sentenced defendant's direct appeal, the reviewing court determines that, even though the evidence did not suffice to support the submission of the sole aggravating circumstance upon which the sentencing judge relied in sentencing the defendant to death, the record did contain sufficient evidence tending to show the existence of an aggravating circumstance that the sentencing judge erroneously found to be legally, rather than factually, inapplicable); *Rumsey*, 467 U.S. at 212, 104 S. Ct. at 2311, 81 L. Ed. 2d at 172 (holding that a trial court's decision at the defendant's initial trial and capital sentencing hearing that no aggravating circumstance existed and that the defendant was not death-eligible under Arizona law was entitled to double jeopardy effect despite a decision made in connection with the State's cross-appeal that the record evidence did, in fact, support a finding of the existence of an aggravating circumstance); *Bullington v. Missouri*, 451 U.S. 430, 446–47, 101 S. Ct. 1852, 1862, 68 L. Ed. 2d 270, 283–84 (1981) (holding that the jury's determination at the defendant's capital sentencing hearing that the defendant should be sentenced to life imprisonment rather than death was entitled to double jeopardy effect despite a decision by the trial court allowing a post-verdict motion and awarding the defendant a new trial on the issue of guilt); *Burks v. United States*, 437 U.S. 1, 17–18, 98 S. Ct. 2141, 2150–51, 57 L. Ed. 2d 1, 13 (1978) (holding

that a final appellate decision that the record evidence did not suffice to support the defendant's conviction was entitled to double jeopardy effect and precluded a retrial); *Morrison v. United States*, 429 U.S. 1, 3–4, 97 S. Ct. 24, 26, 50 L. Ed. 2d 1, 4 (1976) (holding that an acquittal at a bench trial has the same effect as an acquittal by a jury for double jeopardy purposes); *Fong Foo v. United States*, 369 U.S. 141, 143, 82 S. Ct. 671, 672, 7 L. Ed. 2d 629, 631 (1962) (holding that a trial court's determination during the course of the defendant's trial that the defendant should be acquitted on a legally unsupportable ground was entitled to double jeopardy effect). Simply put, the Court has not cited any decision of either the Supreme Court or this Court holding that a postconviction acquittal of the type at issue here is subject to preclusive effect unless and until that decision has become final at the conclusion of the process of appellate review, and I have been unable to find any such decision in the course of my own research. As a result, I feel compelled to conclude that the Court's double jeopardy analysis, which relies upon general statements of double jeopardy jurisprudence that were made in a procedural context that is completely different from the one that is present here, is fundamentally flawed.

In addition, the Court fails to recognize that essentially the same double jeopardy argument that it now finds persuasive was presented to this Court during the proceedings that led to the entry of our 2015 order, from which defendant unsuccessfully sought relief from the Supreme Court and which has, given the absence of such relief, become final. I am unable to read our 2015 order to vacate

Judge Weeks' order and to remand this case to the Superior Court, Cumberland County, as anything other than a rejection of defendant's double jeopardy claim in light of the fact that no such remand would have been permissible had Judge Weeks' order and the related judgment been entitled to double jeopardy effect. As a result, it would appear to me that defendant's double jeopardy claim is, in addition to lacking support in our jurisprudence relating to that constitutional provision, barred by the law of the case doctrine. *Hayes v. City of Wilmington*, 243 N.C. 525, 536, 91 S.E.2d 673, 681–82 (1956) (stating that, "when an appellate court passes on a question and remands the cause for further proceedings, the questions there settled become the law of the case, both in subsequent proceedings in the trial court and on subsequent appeal, provided the same facts and the same questions which were determined in the previous appeal are involved in the second appeal") (citations omitted).

In apparently holding that our 2015 order is a nullity, the Court concludes that the State was not entitled to seek appellate review of Judge Weeks' order and the related judgment and that, by failing to list the judgment that Judge Weeks entered in conjunction with his order concluding that defendant was entitled to relief from his death sentence pursuant to the Racial Justice Act as one of the determinations of which it sought review in the certiorari petition that led to the entry of this Court's 2015 order, the State failed to properly seek and obtain review of Judge Weeks' sentencing decision. I am not persuaded by the Court's reasoning, which overlooks the relevant statutory provisions and the fundamental reason for which the State

sought, and the Court granted further review of Judge Weeks' order granting relief to defendant on the basis of his Racial Justice Act claim and his decision to resentence defendant to life imprisonment.

The North Carolina Constitution provides that this Court "shall have jurisdiction to review upon appeal *any decision of the courts below*, upon any matter of law or legal inference." N.C. Const. art. IV, § 12(1) (emphasis added). While certain statutes generally limit the extent to which this Court is entitled to review the decisions of lower courts, "it is beyond question that a statute cannot restrict this Court's constitutional authority" to supervise the activities of North Carolina's lower courts. *State v. Ellis*, 361 N.C. 200, 205, 639 S.E.2d 425, 428 (2007). For that reason, "[t]his Court will not hesitate to exercise its rarely used general supervisory authority when necessary to promote the expeditious administration of justice." *State v. Stanley*, 288 N.C. 19, 26, 215 S.E.2d 589, 594 (1975). In apparent recognition of our constitutional supervisory authority, the General Assembly has enacted N.C.G.S. § 7A-32(b), which provides that this Court "has jurisdiction . . . to issue the prerogative writs, including . . . certiorari, . . . in aid of its own jurisdiction or in exercise of its general power to supervise and control the proceedings of any of the other courts of the General Court of Justice." N.C.G.S. § 7A-32(b) (2019). This Court has utilized its general supervisory authority to hear appeals concerning motions for appropriate relief despite the absence of any statutory authority to do so and, in some instances, in the face of a statutory prohibition against appellate review of specific types of lower

court orders or decisions. *See, e.g.*, *State v. Todd*, 369 N.C. 707, 709–10, 799 S.E.2d 834, 837 (2017); *Ellis*, 361 N.C. at 200, 639 S.E.2d at 425. As a result, this Court may well have had the authority to review Judge Weeks' order and the related judgment as a constitutional matter.

I see no need for further discussion of the Court's constitutional supervisory authority in this case, however, given that there is explicit statutory authority for the Court's decision to grant a certiorari petition authorizing review of Judge Weeks' original order. The Racial Justice Act expressly provided that "the procedures and hearing on the motion" seeking relief from a defendant's sentence on the basis that racial discrimination played a significant role in the decision to seek or impose the death penalty "shall follow and comply with" a number of statutory provisions governing the litigation of motions for appropriate relief, including "[N.C.G.S. §] 15A-1422." North Carolina Racial Justice Act, S.L. 2009-464, § 1, 2009 N.C. Sess. Laws 1213, 1215 (codified at N.C.G.S. § 15-2012(c) (2009)) (repealed 2013). Subsection 15A-1422(c) provides, in turn, that "[t]he court's ruling on a motion for appropriate relief" is subject to review "[i]f the time for appeal has expired and no appeal is pending, by writ of certiorari." N.C.G.S. § 15A-1422(c) (2019).[5] Thus, the General Assembly

---

[5] The amended Racial Justice Act provided that a defendant's Racial Justice Act claim "shall be raised by the defendant . . . in postconviction proceedings pursuant to Article 89 of Chapter 15A of the General Statutes." An Act to Amend Death Penalty Procedures, S.L. 2012-136, § 3, 2012 N.C. Sess. Laws 471, 472 (enacting N.C.G.S. § 15A-2011(f)(1) (Supp. 2012)) (repealed 2013). Section 15A-1422 falls within Article 89 of Chapter 15A.

expressly granted this Court the authority to review trial court decisions granting or denying relief pursuant to the Racial Justice Act through the use of its certiorari jurisdiction, which is the exact procedural vehicle that the State utilized in seeking and obtaining review of Judge Weeks' order.[6] As a result, I am further compelled to conclude that the Court's apparent determination that Judge Weeks' order granting relief pursuant to the Racial Justice Act was not subject to appellate review is erroneous.

Finally, I am equally unpersuaded by the Court's conclusion that the State's failure to list the judgment that Judge Weeks entered based upon his decision to grant defendant's request for relief from his death sentence pursuant to the Racial Justice Act in the certiorari petition that led to the entry of our 2015 order deprived us of any authority to vacate Judge Weeks' order and the related judgment following appellate review. Aside from the fact that no meaningful request for appellate review of the underlying judgment could be taken apart from review of the order granting defendant's request for relief from his death sentence under the Racial Justice Act

---

[6] The fact that the General Assembly did not grant the State an appeal as of right from orders granting relief pursuant to the Racial Justice Act, upon which the Court places some emphasis in its opinion, has no bearing upon the proper resolution of this case given the General Assembly's decision to expressly authorize appellate review of such orders pursuant to N.C.G.S. § 15A-1422(c)(3) and former N.C.G.S. § 15A-2012(c). Similarly, the fact that N.C.G.S. § 15A-1422(c)(3) makes no mention of proceedings conducted pursuant to the Racial Justice Act is irrelevant to the issue of whether the State was entitled to seek the issuance of a writ of certiorari authorizing review of Judge Weeks' order given that the use of the procedure authorized by N.C.G.S. § 15A-1422(c) was expressly imported into Racial Justice Act proceedings by former N.C.G.S. § 15A-2012(c).

and the fact that the State's certiorari petition cannot be understood as anything other than a challenge to the correctness of both Judge Weeks' order and the judgment that was entered in reliance upon that order, the Court's decision, which seems to me to be overly technical for that reason alone, is inconsistent with the relevant statutory provisions governing review of trial court decisions made pursuant to the Racial Justice Act. According to N.C.G.S. § 15A-1422(c), which specifically provides for review of "[t]he court's ruling on a motion for appropriate relief," the order or decision that is subject to further review is the "ruling on a motion for appropriate relief" rather than any remedial judgment that the trial court might have entered for the purpose of effectuating its decision to afford relief to a defendant. I have a great deal of difficulty seeing how the General Assembly could have intended for this logic to permit review of the order entered in connection with the allowance of a motion for appropriate relief while requiring a separate request for review of the judgment that the trial court entered based upon the underlying order. The interpretation of N.C.G.S. § 15A-1422(c) that I believe to be appropriate is fully consistent with our certiorari-related jurisprudence, which brings the entire record forward for review and recognizes the fundamental principle that the trial court's judgment flows logically from the proceedings that led to its entry. *State v. Moore*, 258 N.C. 300, 302, 128 S.E.2d 563, 565 (1962); *In re Burton*, 257 N.C. 534, 545, 126 S.E.2d 581, 589 (1962). As a result, I believe that, in light of the language in which the relevant statutory provisions are couched and the effect of our decision to issue a

writ of certiorari authorizing review of Judge Weeks' order, the fact that the State failed to expressly seek review of the judgment that was entered on the basis of Judge Weeks' order in the certiorari petition that led to the entry of our 2015 order does not have the effect of precluding further review of that judgment.[7]

I do not, by dissenting from the Court's decision in this case, wish to be understood as expressing any doubt about the fundamental importance of the goals sought to be achieved by the Racial Justice Act or the pressing need to completely eradicate racial and all other forms of odious discrimination from our system of justice, to cast any doubt upon the correctness of our recent decision in *Ramseur*, or to express any opinion concerning the extent to which the Court did or did not correctly grant relief from Judge Weeks' order in 2015, which was a decision in which I did not participate. However, it seems clear to me that a trial court order granting relief pursuant to the Racial Justice Act and the entry of a related judgment of life imprisonment is not an unreviewable decision entitled to double jeopardy protection, with there being no support for a contrary result in the relevant decisions of this Court or the Supreme Court or in the statutory provisions governing our review of lower court decisions in criminal cases. As a result, I am unable to join the Court's

---

[7] The majority's reference to *State v. Miller,* 205 N.C. App. 724, 725, 696 S.E.2d 542, 543 (2010), has no bearing upon a proper analysis of this case given that the manner in which an appeal must be taken from an order denying a motion to suppress evidence differs from the manner in which appellate review of orders granting or denying relief pursuant to the Racial Justice Act must be sought. *See* N.C.G.S. § 15A-979 (b) (2019) (stating that "[a]n order finally denying a motion to suppress evidence may be reviewed upon an appeal from a judgment of conviction, including a judgment entered upon a plea of guilty").

decision that defendant is entitled to have the sentence of life imprisonment without the possibility of parole that was imposed upon him as the result of Judge Weeks' order to grant defendant relief pursuant to the Racial Justice Act reinstated and would, instead, hold, for the reasons set forth in *Ramseur*, that the trial court erred by dismissing defendant's Racial Justice Act claim based upon the General Assembly's decision to repeal that legislation and that this case should be remanded to the Superior Court, Cumberland County, for further proceedings not inconsistent with this opinion, including the hearing on the merits contemplated in our 2015 order.

Justice DAVIS joins in this dissenting opinion.